**Stafford J. COOLBAUGH, Plaintiff–Appellant,**

v.

**STATE OF LOUISIANA, on Behalf of LA. DEPT. OF PUBLIC SAFETY & CORR., on Behalf of LA. DEPT. OF MOTOR VEHICLES, Defendant–Appellee.**

**No. 96–30664.**

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1998.

William E. Skye, Alexandria, LA, John William Emry, Jr., Franklin, IN, for Plaintiff-Appellant.

David Glen Sanders, Asst. Atty Gen., Baton Rouge, LA, for Defendant-Appellee.

Before DAVIS, SMITH and DUHÉ, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Stafford J. Coolbaugh, a paraplegic, filed this action against the State of Louisiana in federal court alleging that the State violated Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12165 (1994), by discriminating against him on the basis of his disability. The district court denied Coolbaugh's motion for summary judgment and the jury eventually returned a verdict in favor of the State. Coolbaugh has appealed the district court's denial of his summary judgment motion, as well as the take nothing judgment entered on the jury's verdict. Before turning to the merits, we consider whether jurisdiction was proper. Specifically, we consider whether the ADA represents an appropriate Congressional exercise of its Section 5 enforcement power so as to override the State of Louisiana's Eleventh Amendment immunity. In light of the Supreme Court's decisions in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), and *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), we hold that the provisions of the ADA are enforceable against a state because the enactment of this legislation was a valid exercise of Congress' Section 5 enforcement power, and for that reason does not infringe upon Louisiana's rights under the Eleventh Amendment. On the merits, we find no error and affirm.

I.

Coolbaugh and his family moved to Louisiana in 1993 after living in California for many years. While he was a California resident, Coolbaugh received a driver's license permitting him to operate a specially equipped, hand-controlled automobile. Coolbaugh's testimony revealed that he had used his California license for identification purposes, but not to drive. Upon their arrival in Louisiana, Coolbaugh and his wife went to the local Office of Motor Vehicles to obtain Louisiana driver's licenses.

Generally, a new Louisiana resident may obtain a Louisiana driver's license by presenting a valid out-of-state license and passing an eye exam. Coolbaugh's wife, who was not disabled, followed this procedure and obtained a Louisiana driver's license. An employee of the Office of Motor Vehicles told Coolbaugh, however, that in addition to the usual requirements, he must complete a special medical form and pass a road test in his own hand-controlled vehicle. Although Coolbaugh's doctor certified that Coolbaugh could safely drive a "handicapped controlled vehicle," Coolbaugh failed to supply his own hand-controlled vehicle or otherwise to take and pass the required road test. As a result, Louisiana declined to issue Coolbaugh a Louisiana driver's license.

Coolbaugh brought the current action against the State of Louisiana in federal court alleging that the State violated Title II of the ADA by treating him and his nondisabled wife differently with respect to the issuance of Louisiana driver's licenses. The district court denied Coolbaugh's motion for summary judgment, and the case proceeded to trial. The jury returned a verdict in favor of Louisiana, finding that the State had not discriminated against Coolbaugh on the basis of a disability. Coolbaugh appeals both the district court's denial of his motion for summary judgment and the jury's verdict.

II.

The Eleventh Amendment provides immunity to states from suits in federal court by private persons. The Eleventh Amendment states that:

The Judicial power of the United States shall not be construed to extend to any suit

in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by ·Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has broadly construed the Eleventh Amendment's narrow language, to embrace the larger principle that a state is granted immunity from suits initiated by private entities or persons in federal court, if the state has not consented to such suits. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996) ("[W]e have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms.") (quoting *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991)).

Congress has the authority to abrogate states' immunity in certain circumstances pursuant to Congress' powers under Section 5 of the Fourteenth Amendment. Section 5 provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. Among the provisions is Section 1's mandate that

> [n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

*Id.,* § 1.

■ *Seminole Tribe* established a two-pronged test for determining the validity of Congress' abrogation of state immunity through the exercise of its Section 5 enforcement power. First, a court must determine whether Congress "unequivocally expresse[d] its intent to abrogate the immunity." *Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. at 1123 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985)). Second, a court must determine whether Congress acted "pursuant to a valid exercise of power." *Id.* (quoting *Green,* 474 U.S. at 68, 106 S.Ct. at 425–26).

The first prong—Congress' intent to abrogate state immunity—is patently clear in the ADA. Section 12202 of the ADA provides that "[a] State shall not be immune under the eleventh amendment [sic] to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. *See also Clark v. California,* 123 F.3d 1267, 1269 (9th Cir.1997) (finding that in the ADA, Congress "unequivocally expressed its intent to abrogate the State's immunity").

The second prong—whether Congress has abrogated state immunity in the ADA through a valid exercise of its enforcement power—is less clear. The Constitution allows Congress to enforce the Fourteenth Amendment, and the Supreme Court held in *City of Cleburne, Texas v. Cleburne Living Center, Inc.* that disabled persons are protected by the Equal Protection Clause.[1] 473

---

1. We recognize that *Cleburne* specifically addressed the mentally disabled, and not the physically disabled. However, we are persuaded that its reasoning applies to the physically disabled as well. In arguing against extension of heightened scrutiny to mentally disabled individuals, the Court pointed out the difficulty of "distinguish[ing] a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large." *Cleburne,* 473 U.S. at 445, 105 S.Ct. at 3257. The Court then listed such indistinguishable groups, naming "the aging, the disabled, the mentally ill, and the infirm." *Id.* at 446, 105 S.Ct. at 3257. Rejecting the eligibility of these groups for heightened scrutiny, the Court stated, "[w]e are reluctant to set out on that course, and we decline to do so." *Id.* This

assignment of rational basis review to physically disabled persons has been recognized and applied by numerous courts after *Cleburne.* See *Hansen v. Rimel,* 104 F.3d 189, 190 n. 3 (8th Cir.1997) ("Although protected by statutory enactments such as the [ADA], the disabled do not constitute a 'suspect class' for purposes of equal protection analysis."); *Suffolk Parents of Handicapped Adults v. Wingate,* 101 F.3d 818, 824–27 (2d Cir.1996) (applying rational basis standard to claims of handicapped individuals who challenged a state's denial of funding), *cert. denied,* — U.S. ——, 117 S.Ct. 1843, 137 L.Ed.2d 1047 (1997); *Does v. Chandler,* 83 F.3d 1150, 1155 (9th Cir.1996) ("For the purposes of equal protection analysis, the disabled do not constitute a suspect class."); *Spragens v. Shalala,* 36 F.3d 947, 950 (10th Cir.1994) (holding that "a classification applying to blind persons is not suspect, or even quasi-suspect, and we therefore

U.S. 432, 450, 105 S.Ct. 3249, 3259–60, 87 L.Ed.2d 313 (1985).

In *Cleburne,* the City of Cleburne denied a special use permit to a proposed operator of a group home for the mentally retarded. *Id.* at 435–37, 105 S.Ct. at 3251–53. The plaintiffs challenged the denial, arguing that the zoning ordinance requiring a permit violated the equal protection rights of the mentally retarded. *Id.* at 437, 105 S.Ct. at 3252–53. The Supreme Court held that "legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose." *Id.* at 446, 105 S.Ct. at 3257.

Thus, applying *Cleburne,* the disabled are protected by the Equal Protection Clause and Congress is entitled to enforce this protection against the states despite the Eleventh Amendment. The Court last term, however, in *City of Boerne v. Flores,* declared that Congress' power in this respect is not unlimited. —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

*Flores* arose out of the City of Boerne's rejection of the Archbishop of San Antonio's permit application to enlarge a historically significant church. *Id.* at ——, 117 S.Ct. at 2160. The Archbishop brought an action claiming, among other things, that rejection of the permit violated The Religious Freedom Restoration Act of 1993 ("RFRA"). 107 Stat. 1488 (codified at 42 U.S.C. §§ 2000bb to 2000bb–4 (1994)). The Court held that RFRA, legislation passed pursuant to Congress' enforcement power under Section 5 of the Fourteenth Amendment, was unconstitutional because it exceeded Congress' enforcement power. *Flores,* —— U.S. at ——, 117 S.Ct. at 2172.

The *Flores* Court declared that "§ 5 is 'a positive grant of legislative power' to Congress." *Id.* at ——, 117 S.Ct. at 2163 (quoting *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966)). The *Flores* Court restated its longstanding view that

apply the 'rational basis' standard, rather than some more strict one"); *More v. Farrier,* 984 F.2d 269, 271 (8th Cir.), *cert. denied,* 510 U.S.

[w]hatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Id.* at ——, 117 S.Ct. at 2163 (quoting *Ex parte Virginia,* 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879)). The *Flores* Court affirmed the historical principle that Congress has the authority to both remedy and prevent constitutional violations. *Id.* at ——, 117 S.Ct. at 2164–67. In addition, the Court restated its historical view that

[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'

*Id.* at ——, 117 S.Ct. at 2163 (quoting *Fitzpatrick v. Bitzer,* 427 U.S. 445, 455, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976)). In contrast to its affirmation of Congress' Section 5 powers, the Court was clear in its mandate that Congress may not "determine what constitutes a constitutional violation." *Id.* at ——, 117 S.Ct. at 2164.

The *Flores* Court explained Congress' Section 5 authority to adopt legislation that remedies or prevents constitutional violations by reciting examples from earlier cases. *Id.* at ——, 117 S.Ct. at 2166–67. For example, the Supreme Court "upheld a suspension of literacy tests and similar voting requirements under Congress' parallel power to enforce the provisions of the Fifteenth Amendment ... to combat racial discrimination in voting." *Id.* at ——, 117 S.Ct. at 2163 (citing *South Carolina v. Katzenbach,* 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966)) (citation omitted). The Court upheld this legislation to prevent violations despite its earlier decision upholding the constitutionali-

819, 114 S.Ct. 74, 126 L.Ed.2d 43 (1993) (holding that the wheelchair-bound are not a suspect class).

ty of the literacy tests in *Lassiter v. Northampton County Bd. of Elections,* 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). The Supreme Court has "also concluded that other measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States." *Flores,* —— U.S. at ——, 117 S.Ct. at 2163.

In *Flores,* the Court stated that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies." *Id.* at ——, 117 S.Ct. at 2164. The Court held that to be a valid exercise of power under Section 5, "[t]here must be *a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.*" *Id.* (emphasis added). As guidance to applying this test, the Court stated that "[t]he appropriateness of remedial measures must be considered in light of the evil presented." *Id.* at ——, 117 S.Ct. at 2169 (citation omitted).

██ In summary, the Supreme Court has instructed us that Congress is authorized to adopt legislation that remedies or prevents unconstitutional conduct, provided there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at ——, 117 S.Ct. at 2164. This proportionality inquiry has two primary facets: the extent of the threatened constitutional violations, and the scope of the steps provided in the legislation to remedy or prevent such violations.

In making our proportionality review, as *Flores* directs, we must consider the ADA's scope in light of the evil it addresses. We first turn to findings in the ADA where Congress detailed its understanding of the extent of the evil it was addressing—discrimination against the disabled.[2]

(1) some 43,000,000 Americans have one or more physical or mental disabilities,

and this number is increasing as the population as a whole is growing older;

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally.[3]

42 U.S.C. § 12101(a) (1995).

██ We must give these congressional findings substantial deference. "In review-

---

**2.** The findings in the ADA distinguish it from RFRA, 42 U.S.C. §§ 2000bb to 2000bb–4, in which Congress made no specific findings regarding the seriousness or the scope of discrimination against religious persons.

**3.** The principal findings regarding the existence of discrimination are listed above. Congress also found:

(7) individuals with disabilities are a discrete and insular minority who have been faced

ing the constitutionality of a statute, 'courts must accord substantial deference to the predictive judgments of Congress.'" *Turner Broad. Sys., Inc. v. FCC (Turner II)*, —— U.S. ——, ——, 117 S.Ct. 1174, 1189, 137 L.Ed.2d 369 (1997) (quoting *Turner Broad. Sys., Inc. v. FCC (Turner I)*, 512 U.S. 622, 665, 114 S.Ct. 2445, 2471, 129 L.Ed.2d 497 (1994) (Kennedy, J. Op.)).

The Court in *Flores* reaffirmed this bedrock principle when it stated that "[i]t is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." —— U.S. at ——, 117 S.Ct. at 2172 (quoting *Morgan*, 384 U.S. at 651, 86 S.Ct. at 1723–24).

The *Turner II* Court instructs that the judiciary's "sole obligation is 'to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.'" —— U.S. at ——, 117 S.Ct. at 1189 (quoting *Turner I*, 512 U.S. at 666, 114 S.Ct. at 2471 (Kennedy, J. Op.)).

Deference to the judgment of Congress is particularly appropriate in this case, because in *Cleburne*, the Court identified Congress as the ideal governmental branch to make findings and decisions regarding the legal treatment of the disabled. 473 U.S. at 442–43, 105 S.Ct. at 3255–56. In *Cleburne*, the Court stated: "How this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." *Id.*

Before enacting the ADA, Congress considered a wide range of evidence and made findings. Both the House and the Senate cited *seven* substantive studies or reports to support its conclusion that discrimination against the disabled is a serious and pervasive problem. S.Rep. No. 101–116, at 6 (1989); H.R.Rep. No. 101–485, pt. 2, at 28, U.S.Code Cong. & Admin.News 1990, 267, 309-10 (1990) (Both citing National Council on the Handicapped, *On the Threshold of Independence* (Jan.1988) (updating the legislative changes recommended in *Toward Independence*); *Report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic* (June 1988) (reviewing the medical, financial, ethical, policy, and legal issues that affect those afflicted with HIV); Louis Harris and Associates, *The ICD (International Center for the Disabled) Survey II: Employing Disabled Americans* (1987) (surveying 210 top managers, 301 equal employment managers, 210 department heads and line managers, and 200 top managers in companies employing 10–49 people); Louis Harris and Associates, *The ICD (International Center for the Disabled) Survey of Disabled Americans: Bringing Disabled Americans into the Mainstream* (March 1986) (surveying 1000 disabled persons); National Council on the Handicapped, *Toward Independence* (Feb.1986) (reviewing different laws and programs that affect disabled persons and offering recommendations for legislative changes); U.S. Commission on Civil Rights, *Accommodating the Spectrum of Individual Abilities* (Sept.1983) (reporting on, among other things, the history, nature, and extent of discrimination against the disabled); *From ADA to Empowerment: The Report of the Task Force on the Rights and Empowerment of Americans with Disabilities* (Oct. 12, 1990) (compiling findings and recommendations following the formation of a Task Force, which conducted 14 Washington, D.C., teleconference meetings with participants

---

with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;

(8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, indepen-

dent living, and economic self-sufficiency for such individuals; and

(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

42 U.S.C. § 12101(a)(1995).

from across the country, held 63 public forums in the 50 states and some territories, held other meetings involving 25,000 participants, testified in congressional hearings, met with legislative and executive staff members, met with the President, Vice President and various Cabinet members, and met with opponents of the ADA)). The legislative history also includes a wealth of testimonial and anecdotal evidence from a spectrum of parties to support the finding of serious and pervasive discrimination.[4]

We are satisfied that the extensive record compiled in the legislative history fully supports Congress' detailed findings of a serious and pervasive problem of discrimination against the disabled. As stated above, these findings are entitled to deference. Because Congress found a significant likelihood of unconstitutional actions and therefore a significant "evil" to be addressed, the only remaining inquiry is whether the scope of the ADA is so "sweeping" that the statute cannot be seen as proportional to the evil Congress sought to address.

We are persuaded that Congress' scheme in the ADA to provide a remedy to the disabled who suffer discrimination and to prevent such discrimination is not so draconian or overly sweeping to be considered disproportionate to the serious threat of discrimination Congress perceived. The ADA first sets forth broad provisions generally outlawing discrimination.[5] In addition to these general provisions outlawing discrimination, Congress made specific judgments in particular circumstances as to what it perceived to be reasonable and appropriate to prevent unconstitutional discrimination. For example, in Title I, 42 U.S.C. § 12112(b)(5)(A) declares it discriminatory to reject an employee whose mental or physical limitation may be reasonably accommodated, so long as such accommodation does not cause undue burden; § 12112(d) declares it discriminatory to subject a potential employee to medical examinations or inquiries; and § 12113 provides a defense to an entity that refuses employment to a disabled person when the refusal is "job-related and consistent with business necessity." Included in the provisions of Title II is 42 U.S.C. § 12142(a), which requires entities that purchase or renovate new buses or rail vehicles to ensure that such new or renovated vehicles be accessible to the disabled, and 42 U.S.C. § 12148(b), which requires that at least one car per train is accessible to the disabled. Congress made these particularized judgments after hearing testimony on the reasonableness and feasibility of these provisions. *See, e.g.,* H.R.Rep. No. 101–485, pt. 2, at 44–45 (1990) (citing testimony that businesses will benefit from the ADA be-

---

4. *See, e.g.,* S.Rep. No. 101–116, at 6 (1989)(quoting the testimony of Timothy Cook of the National Disability Action Center, regarding the mentally and emotionally debilitating effects of discrimination); *id.* at 6–7 (quoting the testimony of Judith Heumann of the World Institute on Disability, regarding her personal history of discrimination due to her disability); *id.* at 7 (citing a Washington Post article in March, 1988, profiling a zoo keeper's refusal to admit children with Downs Syndrome); *id.* at 8 (citing testimony about a Kentucky woman who was fired because her son, ill with AIDS, moved into her home so she could provide care for him); *id.* at 7 (citing the discrimination apparent in the facts of *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), in which a child with cerebral palsy was excluded from the classroom because the teacher believed the child's appearance nauseated classmates); *id.* at 9 (citing the testimony of U.S. Attorney General Dick Thornburgh (on behalf of President Bush), profiling the isolation and dependence faced by the disabled); *id.* at 10 (citing the testimony of Harold Russell, Chair of the President's Committee on Employment of People with Disabilities, that a majority of disabled persons require no reasonable accommodation, and many others require only an inexpensive one); *id.* at 12 (citing testimony regarding the inaccessibility of many polling places to disabled persons).

5. Title I and Title II each contain a broad mandate. *See, e.g.,* 42 U.S.C. § 12112(a):

  No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*See also* 42 U.S.C. § 12132:

  [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

cause the labor pool will improve); *id.* at 45 (citing employee expertise and performance benefits that accrue to corporations that make accommodations); *id.* (citing testimony from a former CEO of small and large companies, arguing that the ADA is affordable and is "good business"); *id.* at 46 (citing testimony regarding the Marriott Corporation's success as a result of policies similar to those established in the ADA).

■ In sum, the ADA represents Congress' considered efforts to remedy and prevent what it perceived as serious, widespread discrimination against the disabled. We recognize that in some instances, the provisions of the ADA will "prohibit[ ] conduct which is not itself unconstitutional and intrude[ ] into 'legislative spheres of autonomy previously reserved to the States.' " *Flores,* —— U.S. at ——, 117 S.Ct. at 2163 (quoting *Fitzpatrick,* 427 U.S. at 455, 96 S.Ct. at 2671). We cannot say, however, in light of the extensive findings of unconstitutional discrimination made by Congress, that these remedies are too sweeping to survive the *Flores* proportionality test for legislation that provides a remedy for unconstitutional discrimination or prevents threatened unconstitutional actions.

In concluding that Congress did not exceed its Section 5 power in adopting the ADA, we join the only other circuit that has considered the issue since the Court decided *Flores.* In *Clark,* the Ninth Circuit upheld the constitutionality of the ADA as a proper exercise of Congress' Section 5 power. 123 F.3d at 1270. The panel concluded that

> "[i]n both acts, Congress explicitly found that persons with disabilities have suffered discrimination. Both the ADA and the Rehabilitation Act therefore are within the scope of appropriate legislation under the Equal Protection Clause as defined by the Supreme Court. At the same time, neither act provides remedies so sweeping that they exceed the harms that they are designed to redress."

*Id.* For these reasons, the Ninth Circuit concluded that "both the ADA and the Rehabilitation Act were validly enacted under the Fourteenth Amendment." *Id.*

Congress' inclusion of detailed findings in the ADA is an important distinguishing feature between this case and *Flores.* In con-trast to the extensive findings Congress made in the ADA, Congress made no findings in RFRA of widespread unconstitutional treatment of religious persons. Indeed, the *Flores* Court concluded that "the emphasis of the hearings [related to RFRA] was on laws of general applicability which place incidental burdens on religion." *Flores,* —— U.S. at ——, 117 S.Ct. at 2169. The detailed factual findings in the ADA, which require our deference, are critical to the application of the *Flores* proportionality review.

Also, we are convinced that the threat posed by RFRA to our principles of separation of powers is not similarly posed by the ADA. In the ADA, Congress included no language attempting to upset the balance of powers and usurp the Court's function of establishing a standard of review by establishing a standard different from the one previously established by the Supreme Court. Congress performed one of its traditional legislative functions by finding facts relating to proposed legislation. The Supreme Court may in the future, if it chooses to do so, reconsider the *Cleburne* standard of review in light of the Congressional findings. However, this conflict is not a sufficient reason for us to invalidate the ADA.

The dissent seems to conclude that Congress does not have the power under § 5 to prohibit constitutional conduct. We disagree. The *Flores* court stated

> [l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'

*Id.* at ——, 117 S.Ct. at 2163 (quoting *Fitzpatrick,* 427 U.S. at 455, 96 S.Ct. at 2671).

■ We therefore hold that the ADA represents a proper exercise of Congress' Section 5 enforcement power under the Fourteenth Amendment. As a result, Louisiana is not entitled to Eleventh Amendment immunity from suits brought pursuant to the ADA.

## III.

■ We now turn to the merits. The record fully supports the jury's finding that the state did not discriminate against Mr. Coolbaugh, who was a paraplegic, by requiring that he demonstrate his ability to drive on the state's roadways by taking a driving test. A number of plausible explanations may be offered for the verdict. Perhaps the clearest one that is fully supported by the evidence is that the state's refusal to issue Mr. Coolbaugh a driver's license based on his possession of a California license was not motivated, even in part, by its desire to discriminate against him because of his disability. Rather, its decision was motivated by a desire to protect the public on the state's highways. Mr. Coolbaugh's argument that, absent discrimination, the state would have accepted his California driver's license as sufficient evidence of his ability to drive was particularly unpersuasive. The evidence revealed that though Coolbaugh held a valid California driver's license, he had not actually driven a vehicle since obtaining his license, and had used the license only for identification purposes. Because the verdict is fully supported by the record and we find no reversible error, the judgment of the district court is affirmed.

AFFIRMED.

JERRY E. SMITH, Circuit Judge, dissenting:

The majority fundamentally misreads *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), and the resulting inquiry for determining the proper "congruence" and "proportionality" of Congress's exercise of its enforcement powers under section 5 of the Fourteenth Amendment. The opinion successfully distinguishes, at best, the *Flores* Court's alternate holding, and, at worst, its *dicta.* Because the issue we face is directly controlled by the core holding of *Flores,* I respectfully dissent from

the majority's diligent effort to resolve this difficult problem.

### I.

#### A.

The majority relies primarily on congressional findings to distinguish the ADA from RFRA: "Congress' inclusion of detailed findings in the ADA is an important distinguishing feature between this case and *Flores.*" Op. at 438. This "important distinguishing feature," alone, however, cannot meet the "congruence and proportionality" standard outlined in *Flores.*

In *Flores,* the Court saw a myriad of problems with RFRA, *just one* of which was that there were inadequate findings to support the congressional judgment. The Court went to great lengths to note the independence of RFRA's constitutional infirmities: *"Regardless of the state of the legislative record,* RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning." *Flores,* at ——, 117 S.Ct. at 2170 (emphasis added). Without more, therefore, the majority's primary justification for distinguishing the ADA from RFRA logically fails.

#### B.

Unlike the majority, I regard the central issue not to be the presence or absence of congressional findings. That issue obscures the crux of the problem, which is whether, in the ADA, Congress, consistently with the Fourteenth Amendment, could increase the level of judicial scrutiny for states' actions that incidentally burden disabled persons. In the wake of *Flores,* it could not.[1]

#### 1.

In *Flores,* the Court rejected the notion that Congress can expand the substantive scope of constitutional rights using its section 5 powers:

1. Unfortunately, not only does the majority fundamentally misread *Flores,* but it also fundamentally misconstrues the crux of this dissent. My argument does not rely (as the majority says) on the premise that "Congress does not have the power under § 5 of the Fourteenth Amendment

to prohibit constitutional conduct." Op. at 438. Instead, my view, as was the Supreme Court's in *Flores,* is that Congress does not have the power to tell us what is, or is not, constitutional conduct in the first place. *See Flores,* at ——, 117 S.Ct. at 2164.

Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

*Flores,* at ——, 117 S.Ct. at 2164 (brackets in original). The Court decided that, in enacting RFRA, Congress had impermissibly attempted to expand the scope of substantive constitutional rights under the Fourteenth Amendment by subjecting generally applicable laws that had the effect of burdening religion to a higher level of judicial scrutiny than what had been deemed appropriate in *Employment Division v. Smith,* 494 U.S. 872, 887–88, 110 S.Ct. 1595, 1604–05, 108 L.Ed.2d 876 (1990): "Regardless of the state of the legislative record," Congress could not create a substantive constitutional right to "strict scrutiny" for these laws to which the Supreme Court had already determined that a lower standard of review should apply. *See Flores,* at ——, 117 S.Ct. at 2170. The Court noted RFRA's cardinal vice:

The stringent test RFRA demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved. If an objector can show a substantial burden on his free exercise, the State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest.... Laws valid under *Smith* would fall under RFRA without regard to whether they had the object of stifling or punishing free exercise. We make these observations ... to illustrate the substantive alteration of [*Smith's*] holding attempted by RFRA. Even assuming RFRA would be interpreted in effect to mandate some lesser test, say one equivalent to intermediate scrutiny, the statute nevertheless would require searching judicial scrutiny of state law with the attendant likelihood of invalidation. This is a considerable congressional invasion into the States' traditional prerog-

atives and general authority to regulate for the health and welfare of their citizens. *Id.* at ——, 117 S.Ct. at 2171.

### 2.

In *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Court rejected this court's attempt to make the mentally disabled a suspect, or quasi-suspect, class for Equal Protection purposes: "[W]e conclude for several reasons that the Court of Appeals erred in holding mental retardation a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation." *Cleburne,* at 442, 105 S.Ct. at 3255. The Court determined that state legislation having incidental burdens on the disabled would be subject to rational basis scrutiny, *see id.,* under which state action affecting the disabled is constitutional if "rationally related to a legitimate governmental purpose." *Id.* at 446, 105 S.Ct. at 3257. The holding of *Cleburne,* therefore, sets the outer bounds of congressional remedial powers under section 5:

Congress' section five enforcement power, as it pertains to the Equal Protection Clause in cases not involving suspect or quasi-suspect classes or fundamental interests, is limited to the elimination of arbitrariness or the effects of arbitrary government action, and does not permit Congress to prohibit or otherwise target reasonable state decisions or practices.

*Mills v. Maine,* 118 F.3d 37, 47 (1st Cir. 1997).

### 3.

RFRA's similarity to the ADA is striking, and compels the conclusion that *Flores* controls the instant case. Both RFRA and the ADA purport to establish greater rights for individuals against the states by increasing the measure of judicial scrutiny for conflicting state actions to a level higher than the Supreme Court has found appropriate under the Fourteenth Amendment.

As the majority opinion reflects, *see* Op. at 437–438, the ADA increases the judicial scrutiny level applicable for disabled persons by

requiring a closer nexus between the governmental purpose and the governmental means than presently exists under rational basis scrutiny. The ADA mandates an affirmative justification for a state action that has the effect of incidentally burdening these non-suspect classes of persons; a state's actions are no longer presumptively valid if rationally related to the interests that they serve. Instead, the state must make "reasonable accommodations" for the disabled—and only once the state can show that it cannot "reasonably accommodate" will the courts validate the state's chosen policy. *See* 42 U.S.C. § 12101 *et seq.*

Such "searching judicial scrutiny" is incompatible with the more lenient rational basis test. Accordingly, the ADA, by its very terms, "remedies" more than "arbitrary" local governmental actions against the disabled. The *Flores* Court could well have spoken about the ADA by changing but a few words:

> The stringent test [the ADA] demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved. If an objector can show a substantial burden [of his rights under the ADA], the State must [show that it cannot reasonably accommodate him].... Laws valid under [*Cleburne*] would fall under [the ADA] without regard to whether they [were rationally related to a legitimate governmental purpose]. We make these observations ... to illustrate the substantive alteration of [*Cleburne's*] holding attempted by [the ADA]. Even assuming [the ADA] would be interpreted in effect to mandate some lesser test, say one equivalent to intermediate scrutiny, the statute nevertheless would require searching judicial scrutiny of state law with the attendant likelihood of invalidation. This is a considerable congressional invasion into

the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens.

*Flores,* at ——, 117 S.Ct. at 2171 (illustrative alterations added).

The majority attempts to meet these arguments, stating:

> Also, we are convinced that the threat posed by RFRA to our principles of separation of powers is not similarly posed by the ADA. In the ADA, Congress included no language attempting to upset the balance of powers and usurp the Court's function of establishing a standard of review different from the one previously established by the Supreme Court.

Op. at 438. For the majority, the proposition is self-evident; its "deference" to Congress is so great that it does not recognize what should be apparent: Congress's definition of a constitutional violation where there previously was none. Congress has done so by the "reasonable accommodation" language in the ADA, which increases the judicial scrutiny level for the disabled above that set forth in *Cleburne.*[2]

## II.

Some may resist the resolution I suggest, because of a fear that it would eviscerate the basic protections the ADA gives disabled individuals against discriminatory state action. Those fears are unfounded, however.

Congress enacted the ADA under both the Commerce Clause and section 5. Of the two congressional powers, after *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), only the Fourteenth Amendment can provide a vehicle for abrogating a state's protection, under the Elev-

---

**2.** Although the majority decides to side with *Clark v. California,* 123 F.3d 1267, 1270 (9th Cir.), *petition for cert. filed,* 66 U.S.L.W. 3308 (Oct. 20, 1997) (No. 97-686), I choose instead to rely on the better-reasoned opinion in *Brown v. North Carolina Div. of Motor Vehicles,* 987 F.Supp. 451, 458 (E.D.N.C.1997)): "Because the Supreme Court held in *Cleburne* that disabled people are not a class entitled to increased Fourteenth Amendment protection, this Court cannot now decide that Congress had the power to declare otherwise in the ADA. Thus, Congress is outside its Enforcement Clause authority in attempting to abrogate North Carolina's sovereign immunity with the ADA."

enth Amendment, from suit in federal court. *See Seminole Tribe, id.* at 59, 116 S.Ct. at 1125. Under this reasoning, therefore, while an ADA suit against a state could not go forward *in federal court,* the plaintiff still could sue a state *in state court* [3] to enforce the obligations the state owes the disabled under the ADA.[4]

Unlike the majority, therefore, I would repose my confidence in the state courts to enforce the ADA's guarantees against the states. I would dismiss this claim, without

prejudice, as barred by the Eleventh Amendment.[5] Accordingly, I respectfully dissent.

---

**3.** Congress has abrogated the states' sovereign immunity from suit *in state courts* under the ADA. *See* 42 U.S.C. § 12202.

**4.** Although I believe that the Fourteenth Amendment's enforcement power cannot support the ADA's enactment, most would agree that Congress's power to regulate interstate commerce, as it is now defined by the Supreme Court, supports the ADA's imposition of anti-discrimination obligations on private actors engaging in such commerce. To the extent these obligations are "generally applicable" ones, the commerce power, therefore, also may support Congress's power to subject the states to these burdens. *See Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 556, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

I express no opinion whether the particular relief Coolbaugh seeks would fit within the *Garcia* framework. After *Seminole Tribe,* that inquiry most likely falls to the state courts to decide in the first instance.

**5.** Throughout, I have assumed that the Eleventh Amendment issue is properly before our court. Still, I am uncomfortable with the posture in which that issue was raised and decided in this case. The parties had not initially raised or briefed this issue in this court or the district court. In response to this court's request for briefing on the applicability of the Eleventh Amendment, the state submitted a two-page letter rejecting federal jurisdiction based on its analysis of *Seminole Tribe;* the state did not indicate whether it had waived its immunity.

The Eleventh Amendment, in a very real sense, goes to our jurisdiction under Article III to decide this case. Raising this *sua sponte* is problematic, however, in light of *Patsy v. Board of Regents,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982), in which the Court stated: "[B]ecause of the importance of state law in analyzing Eleventh Amendment questions and because the State may, under certain circumstances, waive this defense, we have never held that [the Eleventh Amendment] is jurisdictional in the sense that it must be raised by this Court on its own motion."

The result of this footnote in *Patsy* has been disarray in the lower federal courts. *See, e.g.,*

*Hoffman v. Hunt,* 126 F.3d 575, 582 n. 6 (4th Cir.1997) (following the footnote and refusing to reach the Eleventh Amendment issue because it was not raised by the parties); *Flores v. Long,* 110 F.3d 730, 732 (10th Cir.1997) (noting the *Patsy* language and refusing to decide whether the rule is discretionary or mandatory); *Wilson-Jones v. Caviness,* 99 F.3d 203, 206 (6th Cir.1996) (exercising *sua sponte* review of the Eleventh Amendment issue and finding that *Seminole Tribe* abrogates the footnote), *modified on other grounds,* 107 F.3d 358 (6th Cir.1997); *Komyatti v. Bayh,* 96 F.3d 955, 960 n. 4 (7th Cir.1996) (noting the *Patsy* language); *Mascheroni v. Board of Regents,* 28 F.3d 1554, 1558 (10th Cir.1994) (noting *Patsy* and debating—without deciding— whether the rule is mandatory or permissive); *Cross–Sound Ferry Servs., Inc. v. I.C.C.,* 934 F.2d 327, 341 (D.C.Cir.1991) (Thomas, J., concurring in part) (noting *Patsy* ).

One court has treated the Eleventh Amendment as an affirmative defense in light of *Patsy.* *See ITSI TV Prods., Inc. v. Agricultural Ass'ns,* 3 F.3d 1289, 1291 (9th Cir.1993). Although this captures the spirit of the *Patsy* footnote, it ignores the teachings of *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974), to the effect that the Eleventh Amendment can be raised by the state for the first time on appeal.

Not surprisingly, the academy has commented on the *Patsy* footnote. *See* RICHARD H. FALLON, ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1098 n. 2 (4th ed.1996). Most seem to conclude that the ban on *sua sponte* review is a prudential, discretionary rule, rather than a mandatory one. *See, e.g.,* H. Stephen Harris & Michael P. Kenney, *Eleventh Amendment Jurisprudence After* Atascadero: *the Coming Clash with Antitrust, Copyright, and Other Causes of Action over Which the Federal Courts Have Exclusive Jurisdiction,* 37 EMORY L.J. 645, 720 n. 132 (1988); Thomas R. Johnson, Note, *The Eleventh Amendment—the Fourth Circuit's Adaptation of* Hess v. Trans–Hudson Port Authority Corp. *in* Gray v. Laws, 75 N.C. L. REV. 347, 375 n. 143 (1996); Robert J. Martineau, *Subject Matter Jurisdiction as a New Issue on Appeal: Reining in an Unruly Horse,* 1988 B.Y.U. L. REV. 1, 35 n. 191.