IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 99-50811

---

NELL NEINAST,

                                        Plaintiff-Appellant,

versus

STATE OF TEXAS; TEXAS DEPARTMENT
OF TRANSPORTATION; DAVID M. LANEY;
ROBERT NICHOLS; JOHN W. JOHNSON;
CHARLES W. HALD; JERRY DIKE; VEHICLE
TITLES AND REGISTRATION DIVISION,

                                        Defendants-Appellees.

---

Appeal from the United States District Court
For the Western District of Texas

---
June 26, 2000

---

Before REYNALDO G. GARZA, HIGGINBOTHAM, and BENAVIDES, Circuit
Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Today we review a challenge under the Americans with
Disabilities Act ("ADA") to Texas's fee for handicapped parking
placards in light of jurisdictional and immunity defenses by the
State.  Texas asserts that Nell Neinast cannot bring this suit in
federal court because the placard charge is a tax, barring our
review under the Tax Injunction Act, 28 U.S.C. § 1341, and because
the ADA regulation at issue does not validly abrogate Texas's

immunity from suit under the Eleventh Amendment. We hold that the charge is a fee unaffected by the Tax Injunction Act. We also conclude that because an administrative creature of Congress may not have greater power than the Congress to abrogate the states' immunity, a challenged regulation must be proportionate and congruent to the constitutional wrongs identified by the agency's enabling statute. Finding that the regulation does not do so, we hold that Neinast's suit is barred by the Eleventh Amendment.

I

This putative class action[1] seeks injunctive relief and monetary damages for a $5 fee charged by Texas for handicapped placards.[2] These placards enable disabled individuals to park in specially designated parking spaces; an individual need obtain one only if she does not own a car or wishes to ride in the vehicle of a non-disabled individual.[3] The Texas Transportation Code states that the fees will be "deposited in the state highway fund to defray the cost of providing the disabled parking placard."[4]

---

[1]As the district court decided the dispositive motion on review at the outset of the lawsuit, the class has not yet been certified.

[2]See TEX. TRANS. CODE ANN. §§ 681.002, 681.003.

[3]If the individual owns a car, she would have a license plate. The handicapped symbol on a license plate also authorizes parking in handicapped spaces, and such license plates cost no more than a regular license plate. See § 502.253(a), (d).

[4]§ 681.005.

Neinast, who is disabled, paid the five dollar fee and obtained a placard.

Neinast filed suit in federal court, arguing that the fee charged violates an ADA regulation prohibiting a governmental entity from placing a surcharge on an individual with a disability to cover the costs of measures required under the Act.[5] Twenty days after Neinast filed suit, Texas filed a motion to dismiss on the ground that the federal court lacked jurisdiction pursuant to the Tax Injunction Act. The district court granted that motion, and Neinast appealed. On appeal, Texas contends not only that the Tax Injunction Act but also the Eleventh Amendment bars the federal suit.

II

First, the question before the district court: whether federal jurisdiction is barred by the Tax Injunction Act.[6] That statute prevents federal courts from enjoining, suspending or restraining the assessment, levy or collection of any tax under state law as long as a plain, speedy and efficient remedy may be had in the

---

[5]See 28 C.F.R. § 35.130(f) (2000).

[6]We first address the statutory jurisdiction question in order to, if possible, avoid a constitutional question. See Vermont Agency of Natural Resources v. United States ex rel. Stevens, 2000 WL 646252 (S. Ct. 2000); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 97 n.2 (1998) (noting Supreme Court's choice of order between statutory and constitutional jurisdictional questions).

courts of that state.[7]  The Act functions as a broad jurisdictional impediment to federal court interference with the administration of state tax systems.[8]

The applicability of the Act turns on whether the placard charge is a "tax" or instead a "fee."  The leading case in this area, San Juan Cellular Telephone Company v. Public Service Commission, describes the distinction as a spectrum with the paradigmatic fee at one end and the paradigmatic tax at the other.[9] The classic fee is imposed (1) by an agency, not the legislature; (2) upon those it regulates, not the community as a whole; and (3) for the purpose of defraying regulatory costs, not simply for general revenue-raising purposes.[10]  Whether a charge is a fee or a tax is a question of federal law.[11]

Applying these factors to the Texas statute at hand, we find that the first factor, whether the charge is imposed by the legislature or an agency, suggests that the charge is a tax because it is imposed by the Texas legislature.  The second factor, on whom the charge is imposed, suggests that the charge is a fee: the

---

[7]28 U.S.C. § 1341 (2000).

[8]See Home Builders Assoc. of Miss., Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998).

[9]San Juan Cellular Tel. Co. v. Public Serv. Comm'n, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, C.J.).

[10]Home Builders, 143 F.3d at 1011.

[11]Id. at 1010 n.10.

4

charge is imposed only on a narrow class of persons, disabled people wanting a placard, not the public at large.

The third factor, the ultimate use of the funds, thus becomes our critical question.[12] The relevant provision in the Texas Transportation Code requires that the placard charges go into the general highway fund to help defray the cost of the program.[13] Texas argues that the funds will more likely provide a benefit to the community in the highway fund than actually defray the cost of the program. According to this interpretation, however, no charges would be fees unless they are funneled into a segregated account. If the costs of the placard program are paid out of the general highway fund, then charges paid back into the fund do help defray the program's costs.

Texas also argues that the charge is a tax because it first goes to the tax collector, then the highway fund. This formalism is unhelpful. The opinion on which Texas relies, <u>Hexom v. Oregon Department of Transportation</u>, specifically rejected this analysis: it declined to characterize the fee based on the initial fund it goes to, observing that the question is not where the money is deposited, but the purpose of the assessment.[14]

---

[12]<u>See</u> <u>Marcus v. Kansas</u>, 170 F.3d 1305, 1311 (10th Cir. 1999).

[13]TEX. TRANS. CODE ANN. § 681.005(1).

[14]<u>See</u> 177 F.3d 1134, 1138 (9th Cir. 1999).

5

The purpose here is described narrowly as being for the benefit of the program itself.  This fact distinguishes this case from Home Builders Association of Mississippi, Inc. v. Madison, cited by Texas.  There, a municipality imposed an assessment on developers and builders to "pay a fair share of providing and maintaining . . . essential municipal services."  The collected funds would be used for a variety of municipal services, including streets, fire and police departments, and parks and recreation.[15]

Several recent opinions have examined handicap placard surcharges and found them to be "fees" where the funds were to be spent for narrowly defined purposes.  For example, in Marcus v. Kansas, the fee went into a special fund for the administration of the motor vehicle registration program, with excess funds at the end of the year channeled into the state's highway fund.  The court held that the funds were primarily regulatory and thus "fees" for purposes of the Tax Injunction Act.[16]  The cases in which courts have found placard charges to be taxes were ones in which the funds went for general revenue purposes.[17]  As the Texas statute applies

---

[15]Home Builders, 143 F.3d at 1012.

[16]Marcus v. Kansas, 170 F.3d at 1311-12.  See also Hexom, 177 F.3d at 1138 (holding surcharge was a fee where it went into a general fund but was used to defray costs of program); Thorpe v. Ohio, 19 F. Supp.2d 816, 823 (S.D. Ohio 1998) (same).

[17]See Hedgepeth v. Tennessee, 33 F. Supp. 2d 668, 671-73 (W.D. Tenn. 1998) (funds went into highway fund, general fund, policy pay supplemental fund, trooper safety fund; no evidence of relationship to placard program); Lussier v. Florida, 972 F. Supp. 1412, 1420 (M.D. Fla. 1997) (holding that funds that went to defray costs of

the charges toward the cost of the program, the district court erred in holding that the placard funds were a tax and thus within the scope of the Tax Injunction Act.

## III

We turn to Texas's contention that the ADA regulation at issue exceeds Congress's power under § 5 of the Fourteenth Amendment to abrogate the states' immunity. Texas did not raise this issue before the district court.

Although we are empowered to consider an Eleventh Amendment defense raised for the first time on appeal,[18] we must consider whether Texas's failure to raise the issue below effectively waived its claim to immunity. A state's waiver of immunity must be unequivocal.[19] It may evidence that waiver, however, through action other than an express renunciation. Courts have found waiver in two general varieties of cases: where the state asserted claims of

---

program were a "fee;" other funds, which had a mixed revenue raising and regulatory purpose, were a tax); Rendon v. Florida, 930 F. Supp. 601, 604 (S.D. Fla. 1996) (holding that the assessment at issue was a tax because it bore no relationship to the cost of regulating the program).

[18]See Calderon v. Ashmus, 118 S. Ct. 1694, 1697 n.2 (1998).

[19]See Atascadero State Hosp. v. Scanlon, 105 S. Ct. 3142, 3147 (1985).

its own[20] or evidenced an intent to defend the suit against it on the merits.[21]

The common thread among these cases is that the state cannot simultaneously proceed past the motion and answer stage to the merits and hold back an immunity defense. For example, in Hill v. Blind Industries and Services of Maryland, the state entity waited until the first day of trial to assert its immunity. Disallowing the defense on appeal, the Ninth Circuit noted that the wait allowed the state to have the best of both worlds; it could monitor how the suit was proceeding on the merits but have any adverse ruling set aside on Eleventh Amendment grounds.[22]

Here, Texas's only filing was a motion to dismiss based on the Tax Injunction Act. Texas never filed an answer or participated in any proceedings indicating an intent to try the matter on the merits.[23] Because the district court granted Texas's 12(b)(6)

---

[20]See, e.g., Dekalb County Div. of Family & Children Servs. v. Platter, 140 F.3d 676, 680 (7th Cir. 1998) (state waived immunity by filing an adversary proceeding in bankruptcy court); Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Auth., 744 F.2d 880, 886 (1st Cir. 1984) (immunity waived where state filed counterclaim and third-party complaint).

[21]See Hill v. Blind Indus. & Servs. of Maryland, 179 F.3d 754, 763 (9th Cir. 1999) (collecting cases).

[22]179 F.3d at 756–57.

[23]As such, Texas filed no "pleading" as defined by Fed. R. Civ. P. 12. This fact defeats Neinast's argument that Texas waived immunity by failing to comply with a local district court rule imposing time requirements on immunity claims; those requirements would only have been triggered by the filing of a pleading. See Local Court Rule CV-12 of U.S. Dist. Ct. for Western District of

motion, Texas never had occasion to contest its presence in federal court on other grounds.  Texas gained no benefit by federal court jurisdiction and did not lead Neinast to believe that it intended to try the case in federal court.[24]  Texas did not unequivocally waive its right to assert immunity from suit.

Now to the merits of Texas's Eleventh Amendment challenge. The Eleventh Amendment secures the states' immunity from private suits for monetary damages filed in federal court.[25]  Congress has the power to abrogate that immunity under § 5 of the Fourteenth Amendment, but only within its remedial powers under § 5.[26]

Whether Congress is exercising its remedial power or impermissibly defining new rights is measured by the Supreme Court's two-part "congruence and proportionality" test.  First, there must be evidence from the legislative record or elsewhere that Congress  identified a pattern of constitutional wrongdoing. Second, the court must consider whether the provisions are

---

Texas.  As the rule was not triggered, we need pass no judgment as to whether such local requirements could be evidence of waiver by a state.

[24]As we hold that Texas did not waive its immunity through its actions, we do not reach the issue of whether the Attorney General was authorized under Texas law to consent to federal court jurisdiction on behalf of the State of Texas.  See Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 469 (1945).

[25]See Edelman v. Jordan, 415 U.S. 651, 663 (1974).

[26]See Kimel v. Florida Bd. of Regents, 120 S. Ct. 631, 644 (2000).

9

proportional to the remedial goal.[27]  In fashioning a remedy for constitutional violations, Congress has latitude to prohibit conduct which in itself is not unconstitutional.[28]

Texas argues that the regulation at issue exceeds Congress's remedial authority under § 5.  Circuit precedent bars our consideration of whether the ADA as a whole exceeds Congress's power to abrogate under § 5.[29]  Texas, however, presents a different theory: foreclosed from arguing to this court that the entire ADA exceeds the congressional power of abrogation, it contends that we at least must confront whether the regulation exceeds those powers.

Two of our sister Circuits have considered this method and have focused on different lines of analysis.  The Fourth Circuit

---

[27]See Kimel, 120 S. Ct. at 645; Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 119 S. Ct. 2199, 2207 (1999).

[28]See City of Boerne v. Flores, 117 S. Ct. 2157, 2163 (1997).

[29]See Coolbaugh v. Louisiana, 136 F.3d 430, 438 (5th Cir. 1998).  It is unclear to what extent Coolbaugh blessed the ADA insofar as it commands access rather than simply barring discrimination, the less problematic issue; we assume without deciding that it found both regulatory thrusts constitutional.  We note that Coolbaugh was decided before Kimel v. Florida Board of Regents, 120 S. Ct. 631 (2000), which held that the Age Discrimination in Employment Act exceeded Congress's abrogation powers and possibly suggests a more vigorous application of the congruence and proportionality test than the Coolbaugh court gleaned from City of Boerne.  The Supreme Court has now three times granted certiorari to address the § 5 issue in the ADA context; two cases have settled, and one remains pending.  See University of Ala. at Birmingham Bd. of Trustees v. Garrett, 120 S. Ct. 1669 (2000); 68 U.S.L.W. 3649 (April 17, 2000).

decided in <u>Brown v. North Carolina Division of Motor Vehicles</u>[30] that a challenged regulation must independently meet the proportional and congruent test.[31]  The Ninth Circuit looks instead at the statutory scheme as a piece to determine whether it falls under Congress's powers; if it does, the regulation is constitutional and subject to review only under the <u>Chevron</u>[32] standard.[33]

Chevron involves a two-step inquiry.  First, the court must address whether Congress has clearly spoken on a precise issue; if it has, then the agency's interpretation must conform to that policy.  If it has not, the court moves to the second step, which defers to the agency's policy-making interpretation of the statute unless that answer is arbitrary, capricious, or manifestly contrary to the statute.[34]  We are persuaded that in a challenge such as this one, which questions only the power of Congress to regulate the states, not an agency's power to implement by rule and interpret

---

[30]166 F.3d 698 (4th Cir. 1999).

[31]<u>See</u> <u>Brown</u>, 166 F.3d at 703-04.  Since then, another Fourth Circuit panel upheld the constitutionality of the ADA as a statutory scheme but affirmed the court's authority to pass on the constitutionality of individual regulations.  <u>See</u> <u>Amos v. Maryland Dept. of Public Safety & Correctional Serv's</u>, 178 F.3d 212, 221 & n.8 (4th Cir. 1999), <u>reh'g en banc granted, judgment vacated</u>, December 28, 1999.

[32]<u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).

[33]<u>Dare v. California</u>, 191 F.3d 1167, 1176 & n.7 (9th Cir. 1999).

[34]<u>See</u> <u>Chevron</u>, 467 U.S. at 842-43; KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., I ADMINISTRATIVE LAW TREATISE § 3.2 (3d ed. 1994).

11

congressional mandates, <u>Chevron</u> can suggest the wrong question if we move too quickly to its second step. Whether the Department of Justice has rationally or arbitrarily interpreted the ADA in promulgating the regulation at issue does not answer whether Congress could constitutionally have made a certain policy choice.

In making the "step one" inquiry, our operating premise must be that an agency, or as here, an executive office with delegated power to promulgate rules, cannot have greater power to regulate state conduct than does Congress. An agent cannot escape the requirements of proportionality and congruence. At the same time, applying the proportionate and congruent test demands attention to its context. That Congress will not have made findings regarding every discrete topic addressed by individual regulations is the raison d'être of administrative delegation. An agency's promulgation process will thus not yield a record responsive to the inquiries of <u>City of Boerne</u> in isolation from the statutory scheme under which it operates. We first must consider whether <u>Congress</u>, not the agency, has satisfied <u>City of Boerne</u> in imposing a scheme of regulation upon the states.

If the statute satisfies this initial inquiry, we then measure whether the challenged regulation operates within the remedial compass defined by Congress through valid use of § 5 powers. This means that the agency's action must be proportional and congruent to the relevant constitutional wrongs identified by Congress, not simply to other remedial steps taken by Congress directly. In

12

doing so, we do not detract from Chevron's powerful preference that policy choices be made by the representative branches rather than the judiciary.  Rather, we determine only whether the rulemaker has followed the necessary limits of the statute's regulation of the states.

The statute enabling the Department of Justice regulation addresses the denial of access by the states to individuals with disabilities.[35]  Following Coolbaugh, we presume that Congress properly identified unconstitutional discrimination by the states in denying access; the support cited by that court includes Congress's finding that:

> [I]ndividuals with disabilities . . . encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architecture, transportation, and communication barriers . . . failure to make modifications to existing facilities . . . .[36]

Assuming that such findings identify unconstitutional conduct by the state, a statutory remedy that ensures access correlates to the relevant harm identified by Congress.

When we turn to the regulation, we find that it falls outside this access-granting remedial scheme and thus beyond the remedial

---

[35]The statutory provision under which the Department of Justice promulgated the rule reads:[N]o qualified individual shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132 (2000).

[36]Coolbaugh, 136 F.3d at 435 (quoting 42 U.S.C. § 12101(a)).

compass Congress could constitutionally authorize against the states. The regulation reads:

> A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of such measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the non-discriminatory treatment required by the Act or this part.[37]

The regulation's scope goes further than simply requiring states to provide access to their facilities and programs; it bars the sharing of any costs of such measures, a highly intrusive limit on the core state power to choose revenue sources. There is no plausible claim that banning any fees by the state corrects past discrimination against individuals with disabilities regarding access or that it seeks prophylactically to prevent the state from intentionally discouraging them from enjoying access. A requirement as to who bears minimal costs of accommodation relates back not to the relevant constitutional harm, but only to other prophylactic steps. We thus distinguish this situation from Congress's ban through the Voting Rights Act on literacy tests, whose use had been shown to be an effort to discriminate.[38]

This degree of separation leaves the regulation unanchored to a constitutional purpose. It is an impermissible form of regulatory creep. The regulation bears such an attenuated

---

[37] 28 C.F.R. 35.130(f) (2000).

[38] See Boerne, 117 S. Ct. at 2166-67; South Carolina v. Katzenbach, 86 S. Ct. 803, 808-11 (1966).

14

relationship to the remedial goal that it cannot be understood as a remedial or prophylactic response to unconstitutional behavior. We hold that 28 C.F.R. § 35.130(f) exceeds the scope of Congress's power to abrogate the states' immunity under § 5 of the Fourteenth Amendment. Texas is thus not subject to suit without its consent. We affirm the judgment dismissing this case, albeit on different grounds.

AFFIRMED.