# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-1825

_____

| | | |
|---|---|---|
| Christopher B. Alsbrook; | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| United States of America, | * | |
| | * | |
| Intervenor on Appeal, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Eastern |
| City of Maumelle, Arkansas; | * | District of Arkansas. |
| | * | |
| Defendant, | * | |
| | * | |
| Arkansas Commission on Law | * | |
| Enforcement Standards and Training; | * | |
| State of Arkansas; W. C. Brassell, also | * | |
| known as Dub Brassell, Individually | * | |
| and in his capacity as Chairman of the | * | |
| Arkansas Commission on Law | * | |
| Enforcement Standards and Training; | * | |
| Bobby Hilderbrand, Individually and in | * | |
| his official capacity as a member of the | * | |
| Arkansas Commission on Law | * | |
| Enforcement Standards and Training; | * | |
| Willard, Individually and in his official | * | |
| capacity as a member of the Arkansas | * | |
| Commission on Law Enforcement | * | |
| Standards and Training; Elanor | * | |
| Anthony, Individually and in her | * | |
| official capacity as a member of the | * | |

Arkansas Commission on Law     *
Enforcement Standards and Training;     *
Bob Johnston, Individually and in his     *
official capacity as a member of the     *
Arkansas Commission on Law     *
Enforcement Standards and Training;     *
David Muniz, Individually and in his     *
official capacity as a member of the     *
Arkansas Commission on Law     *
Enforcement Standards and Training;     *
Gary Ashcraft, Individually, and in his     *
official capacity as a member of the     *
Arkansas Commission on Law     *
Enforcement Standards and Training,     *
    *
       Defendants/Appellants.     *

—————————

Submitted: January 11, 1999

Filed: July 23, 1999

—————————

Before BOWMAN,[1] Chief Judge, McMILLIAN, RICHARD S. ARNOLD, FAGG, WOLLMAN, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, and MURPHY, Circuit Judges.

—————————

BEAM, Circuit Judge.

Christopher Alsbrook brought this suit against his employer, the City of Maumelle, Arkansas (the City); the State of Arkansas (the State); the Arkansas

---

[1]The Honorable Pasco M. Bowman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on April 23, 1999. He has been succeeded by the Honorable Roger L. Wollman.

Commission on Law Enforcement Standards and Training (ACLEST); and the commissioners of ACLEST, in their official capacities, under Title II of the Americans with Disabilities Act (ADA) and 42 U.S.C. § 1983. He also brought claims against the commissioners, in their individual capacities, under 42 U.S.C. § 1983. The State, ACLEST, and the commissioners (collectively, appellants) moved for summary judgment asserting that the ADA claim was barred by Eleventh Amendment immunity and that the section 1983 claims were barred by Eleventh Amendment immunity, qualified immunity, and failure to state a cause of action against the commissioners in their individual capacities. The district court denied the motion. This interlocutory appeal followed.

We reverse the district court's denial of summary judgment on the ADA claim, because we find that extension of Title II of the ADA to the State exceeds Congress's authority under Section 5 of the Fourteenth Amendment. We also reverse the district court's denial of summary judgment on the section 1983 claim.

## I.      BACKGROUND

ACLEST is an agency of the State of Arkansas which regulates the hiring and certification of law enforcement officers within the State. To be certified as a law enforcement officer, an applicant must meet certain minimum standards established by ACLEST. The standards, set out in Section 1002 of the Rules and Regulations of the Executive Commission on Law Enforcement Standards and Training (Section 1002), provide in pertinent part that "[e]very officer employed by a law enforcement unit shall . . . [b]e examined by a licensed physician and meet the physical requirements prescribed in Specification S-5, Physical Examination." The relevant portion of Specification S-5 states that an applicant must possess visual acuity that can be corrected to 20/20 in each eye.

Christopher Alsbrook began his employment with the Maumelle Department of Public Safety (Maumelle Department) in January 1993, as a public safety officer. Alsbrook's right eye has a corrected vision of 20/30 and cannot be corrected to 20/20 due to a congenital condition called amblyopia. At the time he was hired by the Maumelle Department, Dr. Cosgrove, an ophthalmologist in Little Rock, had written a letter opining that Alsbrook's amblyopia would not impair his ability to perform any activity or type of work.

In May 1993, Alsbrook submitted an application for enrollment in an officer training course at the Arkansas Law Enforcement Training Academy. In the application, Alsbrook's supervisor certified that Alsbrook met the minimum standards for appointment as a law enforcement officer as prescribed in Section 1002.[2] Alsbrook was accepted into the course and successfully completed it in December, 1993. He was then employed as a law enforcement officer with the Maumelle Department. However, because the Maumelle Department never filed a request for certification on Alsbrook's behalf after he completed the training course, Alsbrook was technically functioning as an uncertified law enforcement officer during this time period.[3]

---

[2]It appears from the record that Alsbrook's supervisor thought that Dr. Cosgrove's letter, opining that Alsbrook's amblyopia would not affect his job performance, took care of any problem regarding Alsbrook's inability to meet the visual acuity requirement.

[3]In order for an individual who has completed the officer training course to become a certified law enforcement officer in the State of Arkansas, it is necessary for the employing agency to request certification by the filing of an Application for Award of Law Enforcement Officer Certificate, form F-7. It remains unclear from the record as to why the Maumelle Department failed to apply for Alsbrook's certification. According to Alsbrook, the Maumelle Department told him that the failure to request certification was not uncommon and probably due to administrative oversight. It was not until September 11, 1995, that the Maumelle Department finally requested certification.

In 1995, Alsbrook sought to join the larger Little Rock Police Department which he believed would offer him better opportunities for advancement. After being notified of the results of an eye exam Alsbrook took as part of his application to the Little Rock Police Department, and having reviewed the documentation on Alsbrook's eye condition on file at the Maumelle Department, the training officer in Little Rock informed Alsbrook that he needed to obtain a waiver from ACLEST exempting him from the visual acuity requirement before he could be hired.

On September 5, 1995, Alsbrook appeared before ACLEST requesting a waiver of the visual acuity requirement. ACLEST determined that it did not have the authority to waive the requirement. It undertook a study to determine whether the requirement should be changed, and concluded that the visual acuity requirement was necessary to meet legitimate concerns. On September 19, 1995, ACLEST notified the Maumelle Department that it would not certify Alsbrook due to his eyesight. Because of his inability to obtain a waiver, Alsbrook was denied employment with the Little Rock Police Department. He remained with the Maumelle Department, but was barred from responding to any police calls or working on any police-related paperwork or duties. His salary remained unaffected. Appellants admit that Alsbrook has successfully completed all requirements to be a certified law enforcement officer in the State other than having a corrected vision of 20/20 in his right eye.

Alsbrook brought the present action in federal district court seeking injunctive relief as well as compensatory and punitive damages on the grounds that appellants violated his rights under Title II of the ADA[4] and 42 U.S.C. § 1983 in refusing to

---

[4]Title II of the ADA, captioned "Public Services," provides:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such

certify him as a law enforcement officer because of his disability, or because they regarded him as having a disability.[5]

Appellants moved for summary judgment arguing that: (1) there was no valid abrogation of their Eleventh Amendment immunity under the ADA; (2) the section 1983 claim asserted against appellants in their official capacities was barred by the Eleventh Amendment; (3) the section 1983 claim against the commissioners in their individual capacities for violations of Title II of the ADA failed to state a cause of action because Title II only covers discrimination by a public entity; and (4) in any

---

entity.

42 U.S.C. § 12132.

A qualified individual with a disability is defined as:

> [A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131.

[5]Oral argument revealed that Alsbrook recently received a waiver of the visual acuity requirement and now works as a law enforcement officer with the City of Little Rock. Therefore, the demand for injunctive relief is moot, leaving only Alsbrook's claim for money damages. The claim for money damages appears to be premised on the argument that, had Alsbrook received certification, he would have been employed at a higher salary with the City of Little Rock rather than the salary he had with the Maumelle Department. In addition, Alsbrook claims that lack of certification prevented him from doing off-duty work requiring law enforcement certification, and resulted in emotional distress and loss of reputation.

event, the commissioners were entitled to qualified immunity. The summary judgment motion also asserted that Alsbrook was not disabled within the meaning of the ADA.

The district court denied appellants' motion. It found that because the ADA was enacted pursuant to the Fourteenth Amendment, it represented a valid abrogation of Eleventh Amendment immunity. It also denied summary judgment on the section 1983 claims brought against the commissioners in their individual capacities.[6] In reaching its decision the district court was careful to point out that:

> The narrow holding of this Order is simply that the defendants are not entitled to summary judgment, either in their official or individual capacities. At trial, the defendants may be able to demonstrate that the standards they set are reasonable and rationally related to necessary skills for law enforcement officers. On the record currently before the Court, the defendants are not entitled to judgment as a matter of law.

Alsbrook v. City of Maumelle, No. LR-C-96-68, memo. op. at 9 (E.D. Ark. Mar. 24, 1997).

This interlocutory appeal on the issues of Eleventh Amendment and qualified immunity followed. Pursuant to 28 U.S.C. § 2403(a), the United States has intervened in the appeal to oppose appellants' Eleventh Amendment argument as it pertains to the ADA claim. On appeal, a panel of this court, one judge dissenting, affirmed the district court's denial of summary judgment on the ADA claim, but reversed the district court's denial of summary judgment on the section 1983 claims against the commissioners in their individual capacities. See Alsbrook v. City of Maumelle, 156 F.3d 825 (8th Cir. 1998).

---

[6]The district court order did not mention the § 1983 claim asserted against the appellants in their official capacities.

We granted rehearing en banc, thereby vacating the panel opinion. After consideration by the court en banc, we now reverse the district court's denial of summary judgment on both grounds for the reasons discussed below.

## II.    DISCUSSION

As a preliminary matter, we hold that we have jurisdiction over this interlocutory appeal under the collateral order doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 545-47 (1949). See, e.g., Murphy v. Arkansas, 127 F.3d 750, 753 (8th Cir.1997) (order denying claim of Eleventh Amendment immunity is appealable as a collateral order); Manzano v. South Dakota Dep't of Soc. Servs., 60 F.3d 505, 509 (8th Cir. 1995) (denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine). Issues of law that are closely related to the qualified immunity determination may also be considered on interlocutory appeal. See Henderson v. Baird, 29 F.3d 464, 467 (8th Cir. 1994).

We review a denial of summary judgment de novo. See Hopkins v. Saunders, 93 F.3d 522, 525 (8th Cir. 1996). Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Hopkins 93 F.3d at 525. As in this case, where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. See Crain v. Board of Police Comm'rs, 920 F.2d 1402, 1405-06 (8th Cir. 1990).

## A.    The ADA Claim[7]

Appellants argue that the district court erred in failing to grant them summary judgment on the basis of Eleventh Amendment immunity.  In rejecting appellants' Eleventh Amendment argument, the district court stated: "[t]he Court is unpersuaded by the State defendants' analysis of Eleventh Amendment immunity.  The Americans with Disabilities Act was passed under the auspices of the Fourteenth Amendment as well as the Commerce Clause."[8]

The Eleventh Amendment grants a state immunity from suits brought in federal court by its own citizens as well as citizens of another state.  See U.S. Const. amend. XI; Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).  Congress can, however, abrogate this immunity or a state can waive it.  See Atascadero State Hosp. v. Scanlon,

---

[7]In Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 (1998), the Supreme Court declined to consider whether application of the ADA to state prisons is a constitutional exercise of Congress's power under Section 5 in light of plaintiffs' failure to raise the issue below.

[8]It is unclear from the complaint whether Alsbrook is asserting an ADA claim against the commissioners in their individual capacities.  To the extent that he is, we agree with the panel opinion's conclusion that the commissioners may not be sued in their individual capacities directly under the provisions of Title II.  Title II provides disabled individuals redress for discrimination by a "public entity."  See 42 U.S.C. § 12132.  That term, as it is defined within the statute, does not include individuals.  See 42 U.S.C. § 12131(1); see also Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979) ("[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.").  Furthermore, while no circuit has directly addressed the issue of individual liability under Title II, three have held that there is no liability under Title I against individuals who do not otherwise qualify as "employers" under the statutory definition.  See Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999); Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996); EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1280-82 (7th Cir. 1995).

473 U.S. 234, 238 (1985). It is undisputed that Arkansas has not consented to this suit. Alsbrook contends, however, that Congress abrogated the State's immunity when it passed the ADA.

Congress has a limited power to abrogate Eleventh Amendment immunity. See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976). But because the Eleventh Amendment "implicates the fundamental constitutional balance between the Federal Government and the States," the Supreme Court has cautioned that courts should exercise care before finding abrogation. Atascadero, 473 U.S. at 238; see also Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 99 (1984) ("Our reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system."). Cf. Alden v. Maine, No. 98-436, 1999 WL 412617, at *7 (U.S. June 23, 1999) ("[states'] immunity from private suits central to sovereign dignity").

In order to determine the validity of Congress's abrogation of immunity, we engage in a two-prong analysis. See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55 (1996). First, we determine whether Congress has unequivocally expressed its intent to abrogate the immunity–which is obvious in this case. Section 12202 of the ADA provides that "[a] State shall not be immune under the eleventh amendment . . . from an action in Federal or State court of competent jurisdiction for a violation of this chapter." [9] See 42 U.S.C. § 12202. Thus, we find that Congress, in passing the ADA,

---

[9]We believe that Congress's reference to abrogating Eleventh Amendment immunity in "state court" is mere surplusage because "the Eleventh Amendment does not apply in state courts." Will v. Michigan Dep't of State Police, 491 U.S. 58, 63-64 (1989). Furthermore, the Supreme Court's recent decision in Alden v. Maine, declaring unconstitutional the provisions of the Fair Labor Standards Act purporting to authorize private actions against the states in their own courts without regard to consent, suggests that any attempt by Congress to subject an unconsenting state to suit under Title II would likewise be invalid.

"unequivocally expressed" its intent to abrogate Eleventh Amendment immunity. Accord Coolbaugh v. Louisiana, 136 F.3d 430, 433 (5th Cir.) (finding that Congress's intent to abrogate state immunity is "patently clear" in the ADA), cert. denied, 119 S. Ct. 58 (1998).

Second, we determine whether Congress has acted pursuant to a valid exercise of power. See Seminole Tribe, 517 U.S. at 55. As a threshold matter, we ask whether the ADA was passed pursuant to a constitutional provision granting Congress the power to abrogate. See id. at 59. Following the Supreme Court's holding in Seminole Tribe, Congress can abrogate Eleventh Amendment immunity only if it is acting pursuant to its powers under Section 5 of the Fourteenth Amendment (Section 5). See id. at 59-67. In passing the ADA, Congress stated that it was invoking its powers under Section 5 and the Commerce Clause. See 42 U.S.C. § 12101(b)(4) (listing among the ADA's purposes "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities").

Congress's declaration that a statute is passed pursuant to Section 5 does not, however, end our inquiry under the second prong. We next turn to the question of whether the substantive provisions of the statute are a *constitutional* exercise of that power. See Brown v. North Carolina Div. of Motor Vehicles, 166 F.3d 698, 702-03 (4th Cir. 1999). Section 5 states: "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.[10]

---

[10]Among the provisions in the Fourteenth Amendment is Section 1's mandate that:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor

Thus, the crux of our inquiry boils down to the following question–does Title II of the ADA represent a proper exercise of Congress's Section 5 powers "to enforce" by "appropriate legislation" the constitutional guarantees of the Fourteenth Amendment, in particular, the Equal Protection Clause?[11] See City of Boerne v. Flores, 521 U.S. 507, 517 (1997). If the provision at issue exceeds Section 5 powers, "it is without jurisdictional effect and cannot constitutionally abrogate immunity." Brown, 166 F.3d at 703.

In Boerne, the Supreme Court's most detailed pronouncement on Congress's authority to impose legislation on the states pursuant to its Section 5 powers, the Court held that Congress exceeded its Section 5 powers in enacting the Religious Freedom Restoration Act (RFRA).[12] While the Court in Boerne acknowledged that Congress's

---

deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend XIV, § 1.

[11]We limit the scope of our Section 5 inquiry to Title II of the ADA, under which Alsbrook brought his suit. Although the United States, as intervenor, would prefer that we consider the statute as a whole, we decline to do so. See Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."); Brown, 166 F.3d at 703-05 (declining to engage in "broad-brush" review of the ADA for purposes of determining whether Congress exceeded its Section 5 powers).

[12] The Supreme Court recently expounded on its views of Congress's Section 5 power in Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank, No. 98-531, 1999 WL 412723 (U.S. June 23, 1999) (College Savings II), in which it held that Congress could not abrogate states' immunity under the Patent Remedy Act (PRA) because the statute could not be sustained as legislation enacted to enforce the guarantees of the Fourteenth Amendment. We think the Court's extensive discussion of Congress's Section 5 powers and its application of Boerne to the facts of that case provide further support for the conclusion we reach today.

-12-

powers under Section 5 are broad, it also stated "that as broad as the congressional enforcement power is, it is not unlimited." Boerne, 521 U.S. at 518 (quotations and citations omitted); see Humenansky v. Regents of the Univ. of Minn., 152 F.3d 822, 828 (8th Cir. 1998) ("Congress' § 5 powers, while broad, are not without limits"), petition for cert. filed, 67 U.S.L.W. 3504 (U.S. Feb. 1, 1999) (No. 98-1235); see also EEOC v. Wyoming, 460 U.S. 226, 259 (1983) (Burger, C.J., dissenting on other grounds) (Congress's ability to enact legislation affecting the states under Section 5, "does not mean that Congress has been given a 'blank check' to intrude into details of states' governments at will.").

The Court in Boerne found that Congress's enforcement power under Section 5 was limited to enacting *remedial* legislation. Congress has no authority, the Court emphasized, to enact *substantive* legislation defining the scope of the Fourteenth Amendment's restrictions on the states. See Boerne, 512 U.S. at 519. "Congress does not enforce a constitutional right by changing what the right is." Id. The Court concluded that for legislation to be classified as remedial and therefore a valid exercise of Section 5 power "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id. at 520. Under the reasoning set forth in Boerne, we do not think that extension of Title II of the ADA to the states constitutes a proper exercise of Congress's power under Section 5.[13]

_____

[13]In so holding, we part company with some circuits that have decided this issue. See Kimel v. Florida Bd.of Regents, 139 F.3d 1426 (11th Cir. 1998), cert. granted, 119 S. Ct. 901, 902 (1999); Coolbaugh v. Louisiana, 136 F.3d 430 (5th Cir.), cert. denied, 119 S. Ct. 58 (1998); Clark v. California, 123 F.3d 1267 (9th Cir.1997), cert. denied sub nom. Wilson v. Armstrong, 118 S. Ct. 2340 (1998); Crawford v. Indiana Dep't of Corrections, 115 F.3d 481 (7th Cir. 1997); see also Torres v. Puerto Rico Tourism Co., 175 F.3d 1, 6 n.7 (1st Cir. 1999) (declining to address issue but stating in dicta "we have considered the issue of Congress's authority sufficiently to conclude that, were we to confront the question head-on, we almost certainly would join the majority of courts upholding the [abrogation] provision"). However, in Brown, the Fourth Circuit held that a regulation promulgated under Title II of the ADA, 28 C.F.R.

Alsbrook and the United States, as intervenor, argue that unlike with RFRA, Congress made detailed findings, when passing the ADA, of a serious and pervasive problem of discrimination against the disabled, and that we should defer to Congress's assessment of the problem. We do not dispute that in passing the ADA Congress made extensive findings regarding the discrimination faced by disabled citizens. See 42 U.S.C. § 12101(a); Coolbaugh, 136 F.3d at 436-37 & n.4  (citing to the extensive studies, reports, and testimony compiled in the legislative history of the ADA). We also note that other circuits have relied to a great extent on the existence of congressional findings in determining that Congress did not exceed its Section 5 powers in extending the ADA to the states.[14]

We think, however, that the state of the legislative record, alone, cannot suffice to bring Title II within the ambit of Congress's Section 5 powers if Title II is not "adapted to the mischief and wrong which the Fourteenth Amendment was intended to provide against." Boerne, 521 U.S. at 532 (quotations and alterations omitted); see also id. ("[r]egardless of the state of the legislative record, RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning").  Just recently, the Supreme Court in Saenz v. Roe,  No. 98-97, 1999 WL 303743 (May 17, 1999), noted that "'Congress' power under § 5 . . .  is limited to adopting measures to

§ 35.130(f), exceeded Congress's powers under Section 5.  See Brown v. North Carolina Div. of Motor Vehicles, 166 F.3d 698 (4th Cir. 1999).  But see Amos v. Maryland Dep't of Pub. Safety and Correctional Servs., No. 96-7091, 1999 WL 454509 (4th Cir.  June 24, 1999) (holding that application of Title II of the ADA to state prisons is a constitutional exercise of Congress's power under Section 5).

[14]See, e.g.,  Clark, 123 F.3d at 1270 (finding that because Congress explicitly found that persons with disabilities have suffered discrimination, the ADA is therefore within the scope of appropriate legislation under the Equal Protection Clause); Coolbaugh, 136 F.3d at 438 ("[w]e cannot say, however, in light of the extensive findings of unconstitutional discrimination made by Congress, that these remedies [of the ADA] are too sweeping").

enforce the guarantees of the [Fourteenth] Amendment; § 5 grants Congress no power to restrict, abrogate, or dilute these guarantees.'" Id. at *10 (quoting Katzenbach v. Morgan, 384 U.S. 641, 651 n.10 (1966)).  We think a necessary corollary to this is that Congress may also not pass legislation which attempts to expand, enhance, or add to the guarantees of the Fourteenth Amendment.  See, e.g., Humenansky, 152 F.3d at 827 (stating that Congress's power to enforce the Equal Protection Clause would be virtually unlimited if it is not tied to enforcing judicially recognized equal protection violations).  In short, regardless of the extent of its findings, Congress, under Section 5, only has the power to prohibit that which the Fourteenth Amendment prohibits.

In City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985), the Supreme Court held that under the Equal Protection Clause of the Fourteenth Amendment, state classifications on the basis of mental retardation need only satisfy rational basis review.[15]  We do not think that Title II of the ADA "enforces" the rational relationship standard recognized by the Supreme Court in Cleburne.  The United States, as intervenor, argues that because Cleburne recognized that arbitrary discrimination against the disabled violates the Equal Protection Clause, the ADA, which also prohibits discrimination against the disabled, lies within Congress's enforcement powers.  Congress's enforcement powers under Section 5, it argues, are not limited to only suspect classifications.

We agree that congressional enforcement of equal protection rights under Section 5 is not limited to suspect classifications.  It is *not* enough to say, however, that the ADA falls within Congress's enforcement powers simply because it prohibits

---

[15]Although Cleburne dealt specifically with discrimination against the mentally disabled, we think its reasoning extends to disabilities generally.  Accord Brown, 166 F.3d at 706 ("we cannot extend to the physically disabled, a different standard of protection from that given to the mentally disabled [in Cleburne]); Coolbaugh, 136 F.3d at 433 n.1 (same).

discrimination against the disabled. "[I]t matters *what kind* of discrimination the Constitution prohibits, and whether the ADA was aimed at that kind of discrimination." Kimel, 139 F.3d at 1448-49 n.2 (Cox, J., concurring in part and dissenting in part).[16] And we do not agree with the United States' argument that the ADA enforces the rational basis standard articulated in Cleburne because it merely requires states to show that distinctions made on the basis of disability are not the result of stereotypes or irrational fears but, rather, are based on legitimate governmental objectives.

Title II does far more than enforce the rational relationship standard recognized by the Supreme Court in Cleburne. Under Title II, a state's program, service, or activity, even if rationally related to a legitimate state interest and valid under Cleburne, would be struck down unless it provided "reasonable modifications." See 42 U.S.C. § 12131(2). Only if a state can demonstrate that modifications would "fundamentally alter" the nature of the service, program, or activity, could a court uphold the state's policy. See 28 C.F.R. § 35.130(b)(7); see also Boerne, 521 U.S. at 534; Coolbaugh, 136 F.3d at 440-41 (Smith, J., dissenting) (discussing similar problem with respect to the "reasonable accommodation" requirement of Title I). The specter of open-ended obligations for a state under Title II is further compounded by the fact that, unlike the term "reasonable accommodation" used in Title I, the term "reasonable modification" is not defined anywhere in the statute. Compare 42 U.S.C. § 12111(9) with 42 U.S.C. § 12131.

Nor does enforcement of Title II against the states comport with the rationale behind the Supreme Court's decision to adopt the rational basis test in Cleburne. The Cleburne Court emphasized that a rational basis standard of review would best allow

---

[16]The dissent commits the same fallacy when it states that "Congress did not exceed its authority under § 5 of the Fourteenth Amendment . . . because protection against disability-based discrimination is a well-established Fourteenth Amendment equal protection guarantee." Post at 23.

governmental bodies the flexibility and freedom to shape remedial efforts towards the disabled.  See Cleburne, 473 U.S. at 446.  Title II's provisions detract from this notion, by preventing states from making decisions tailored to meet specific local needs and instead imposing upon them the amorphous requirement of providing reasonable modifications in every program, service, and activity they provide.  Cf. Wyoming, 460 U.S. at 264-65 (discussing intrusion into state sovereignty when Congress acts under Section 5 to enact Age Discrimination in Employment Act).  "This is a considerable congressional intrusion into the State's traditional prerogatives and general authority to regulate for the health and welfare of their citizens."  Boerne, 521 U.S. at 534.

Nevertheless,  appellees  contend that the Supreme Court's statement in Boerne that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States'" indicates that Congress's Section 5 authority can extend beyond conduct which is unconstitutional.  Id. at 518 (quoting Fitzpatrick, 427 U.S. at 455).  We think this passage, which the Court noted was illustrated by Congress's legislation in the voting rights area, is best understood as saying that Congress may prohibit conduct which itself is not necessarily unconstitutional, if to do so would rectify an existing constitutional violation.  See College Savings II, 1999 WL 412723, at *11 (discussing Congress's voting rights legislation as examples of congressional enactments that pervasively prohibit "constitutional state action in an effort to remedy or to prevent *unconstitutional* state action") (emphasis added).  In the present case, it cannot be said that  Title II identifies or counteracts particular state laws or specific state actions which violate the Constitution.  Title II targets *every* state law, policy, or program.  "Preventative measures prohibiting certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional."  Id. at 532.  We do not think that the legislative record of the ADA supports the proposition

that most state programs and services discriminate arbitrarily against the disabled.[17] Indeed, all states in this circuit have enacted comprehensive laws to *combat* discrimination against the disabled, many of them adopted prior to the effective date of the ADA.[18] Cf. Brown, 166 F.3d at 707.

In sum, it cannot be said that in applying Title II of the ADA to the states, Congress has acted to enforce equal protection guarantees for the disabled as they have been defined by the Supreme Court. We find therefore, that the extension of Title II of the ADA to the states was not a proper exercise of Congress's power under Section 5 of the Fourteenth Amendment. Consequently, there is no valid abrogation of Arkansas' Eleventh Amendment immunity from private suit in federal court and the district court lacked subject matter jurisdiction over the ADA claim.

---

[17]The dissent suggests that Congress was not required to make specific findings that the states themselves were discriminating against the disabled. See post at 30. In College Savings II, however, the Supreme Court noted that part of the problem with Congress's attempted abrogation under the PRA was that the legislative record of the PRA provided "little evidence of infringing conduct on the part of the States." 1999 WL 412723, at *8. Consequently, we also disagree with the dissent's attempt to differentiate the Court's holding in College Savings II from the present case on the basis that the legislative record compiled in enacting the PRA, unlike the ADA, did not show a history of widespread deprivation of constitutional rights. In fact, the legislative record of the ADA suffers from exactly the same infirmity that the Supreme Court noted with respect to the legislative record of the PRA–an absence of a showing of widespread discrimination on the part of the states.

[18]See Ark. Code Ann. §§ 16-123-101 et seq.; Iowa Code Ann.§§ 216C.1 et seq.; Minn. Stat. Ann. §§ 363. 01 et seq.; Mo. Ann. Stat. §§ 213.010 et seq.; Neb. Rev. Stat. Ann. §§ 20-126 et seq.; N.D. Cent. Code §§ 14-02.4-01 et seq.; S.D. Codified Laws §§ 20-13-1 et seq.

**B.** **Section 1983 Claims**

Alsbrook also brings section 1983 claims against the appellants for the alleged deprivation of his rights under the ADA. We note first, that a section 1983 suit cannot be brought against the State or ACLEST. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 64 & 70 (1989) (a state and its agencies are not "persons" within the meaning of section 1983); see also Quern v. Jordan, 440 U.S. 332, 345 (1979) (section 1983 does not abrogate a state's Eleventh Amendment immunity). Nor can a section 1983 suit be asserted against the commissioners of ACLEST in their official capacities, because such suit is no different from a suit against the state itself. See Will, 491 U.S. at 70-71.[19] This leaves only the claim against the commissioners in their individual capacities as the sole cognizable section 1983 claim. See Hafer v. Melo, 502 U.S. 21, 23 (1991) (state officials sued in their individual capacities are "persons" for purposes of section 1983).

The substance of Alsbrook's section 1983 claim is that the refusal to grant him a waiver of the visual acuity requirement violated his rights under Title II of the ADA. Appellants argue that the district court erred in failing to grant summary judgment dismissing the section 1983 claim because the individual commissioners are not "public entities" within the meaning of Title II and hence any section 1983 action premised on a violation of Title II fails to state a cause of action. Alternatively, they maintain that the commissioners are protected by qualified immunity. In reversing the district court's denial of summary judgment, the panel opinion held that it would be inconsistent with

---

[19]The exception to this rule is that a state official may be sued in his or her official capacity for injunctive relief. See Will, 491 U.S. 71 n.10 (state officials sued in their official capacities for injunctive relief are "persons" under section 1983 because official capacity actions for prospective relief are not treated as actions against the state). As noted earlier, the only form of relief available to Alsbrook at this point would be money damages. See supra note 5.

the ADA's comprehensive remedial and enforcement scheme to recognize a section 1983 suit predicated solely on alleged violations of the ADA.

Section 1983 provides a federal cause of action for plaintiffs to sue officials acting under color of state law for alleged deprivations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. See 42 U.S.C. § 1983. It is well recognized that a plaintiff may use section 1983 to enforce not only rights contained in the Constitution, but also rights that are defined by federal statutes. See Maine v. Thiboutot, 448 U.S. 1, 4-8 (1980); Arkansas Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 523 (8th Cir. 1993). An exception to this general rule exists when a comprehensive remedial scheme evidences a congressional intent to foreclose resort to section 1983 for remedy of statutory violations. See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 19-21 (1981). Courts should presume that Congress intended that the enforcement mechanism provided in the statute be exclusive. See Pona v. Cecil Whittaker's, Inc., 155 F.3d 1034, 1038 (8th Cir. 1998), cert. denied, 119 S. Ct. 1805 (1999).

We agree with the panel's conclusion that the ADA's comprehensive remedial scheme bars Alsbrook's section 1983 claims against the commissioners in their individual capacities. In Davis v. Francis Howell School District, 104 F.3d 204, 206 (8th Cir. 1997), this court, in dicta, expressed the view that "the comprehensive enforcement mechanisms provided under § 504 [of the Rehabilitation Act] and the ADA suggest Congress did not intend violations of those statutes to be also cognizable under § 1983." More recently, in Pona, we found that, "Congress has provided [Title II] with detailed means of enforcement that it imported from Title VII . . . . [We] think that Congress has, under the applicable legal principles, rather clearly indicated an intention to make the remedies that Title II itself gives the exclusive ones for the enforcement of that subchapter." Pona, 155 F.3d at 1038; see also Holbrook v. City of Alpharetta, 112 F.3d 1522, 1531 (11th Cir. 1997) (holding that a plaintiff may not

maintain a section 1983 action in lieu of, or in addition to, an ADA cause of action if the only alleged deprivation is of employee's rights created by the ADA).

We agree with the conclusions reached in these cases and hold that Title II's detailed remedial scheme bars Alsbrook from maintaining a section 1983 action against the commissioners in their individual capacities for alleged violations of the ADA.[20] More fundamentally, we find that Alsbrook cannot bring a section 1983 claim against the commissioners in their individual capacities when, as we have  earlier concluded, he could not do so directly under the ADA.  See supra note 8; Huebschen v. Department of Health and Soc. Serv., 716 F.2d 1167, 1170 (7th Cir. 1983) ("[A] plaintiff cannot bring an action under section 1983 based upon Title VII against a person who could not be sued directly under Title VII.").  Allowing a plaintiff to bring a section 1983 claim based on violations of Title II against a defendant who could not be sued directly under Title II would enlarge the relief available for violations of Title II.  See Huebschen, 716 F.2d at 1170.  We have consistently stated that section 1983

_____

[20]In reaching its decision that a section 1983 suit could not be maintained against the commissioners in their individual capacities, the panel opinion noted that Alsbrook was not without recourse for the ADA violations he alleged.  We acknowledge that our present holding may seem contradictory, i.e., finding that Alsbrook may not sue the State and its agencies, and yet concluding that the ADA contains a comprehensive remedial scheme barring a section 1983 suit.  In Seminole Tribe, the Supreme Court reached a similar result when it held that Congress could not abrogate the states' immunity to suit under section 2710(d)(7) of the Indian Gaming Regulatory Act, and yet found the Act's detailed remedial scheme precluded application of the doctrine of Ex Parte Young against a state official. See 517 U.S. at 74.  In reaching the latter conclusion, the Court noted "nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known that § 2710(d)(7) [of the Act] was beyond its authority.  If that effort is to be made, it should be made by Congress, and not by the federal courts." Id. at 76.  Similarly, we conclude that the fact that Congress was unaware that it was without authority to abrogate a state's immunity from suit under Title II does not detract from our finding that Title II provides a comprehensive remedial scheme of enforcement.

creates no substantive rights; that it is merely a vehicle for seeking a federal remedy for violations of federally protected rights. See, e.g., Riley v. St. Louis County, 153 F.3d 627, 630 (8th Cir. 1998); Foster v. Wyrick, 823 F.2d 218, 221 (8th Cir. 1987). Thus, Alsbrook is precluded from bringing a section 1983 suit against the commissioners in their individual capacities for alleged violations of Title II of the ADA when he could not do so directly under Title II itself. Because we hold that Alsbrook may not maintain a section 1983 action against the commissioners in their individual capacities, we need not determine whether the commissioners are otherwise entitled to qualified immunity.

## III. CONCLUSION

For the foregoing reasons, we find that Alsbrook's ADA claim is barred by the Eleventh Amendment and that his section 1983 claims are not cognizable. Accordingly, we reverse the decision of the district court.

McMILLIAN, Circuit Judge, with whom RICHARD S. ARNOLD, FAGG and MURPHY, Circuit Judges, join, concurring in part and dissenting in part.

I concur in Part IIB of the majority opinion, but respectfully dissent from Part IIA.

I believe that Congress validly enacted the ADA pursuant to its enforcement authority under § 5 of the Fourteenth Amendment and therefore properly abrogated the Eleventh Amendment when it applied Title II of the ADA to the states. For the sake of brevity, I will not repeat the reasons for this conclusion that I stated in the panel opinion, see Alsbrook v. City of Maumelle, 156 F.3d 825 (8th Cir. 1998), or those stated by the several other circuits which have taken the same position. See supra at

-22-

13-14 n.13 (citing cases).[21]  I will instead take this opportunity to explain why I disagree with the majority's reasoning in this *en banc* decision.

To begin, even accepting as a correct statement of the law the majority's proposed "necessary corollary" to the Supreme Court's holding in <u>Saenz v. Roe</u> – "that Congress may also not pass legislation which attempts to expand, enhance, or add to the guarantees of the Fourteenth Amendment," <u>supra</u> at 15, – Congress did not exceed its authority under § 5 of the Fourteenth Amendment when it enacted Title II of the ADA because protection against disability-based discrimination is a well-established Fourteenth Amendment equal protection guarantee.  <u>See</u> <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 447 (1985) (<u>Cleburne</u>) ("the [disabled], like others, have and retain their substantive constitutional rights in addition to the right to be treated equally by the law").  Similarly, the majority's reference to <u>Humenansky v. Regents of the Univ. of Minn.</u>, 152 F.3d 822, 827 (8th Cir. 1998), for the proposition that "Congress's power to enforce the Equal Protection Clause would be virtually unlimited if it is not tied to enforcing judicially recognized equal protection violations," <u>supra</u> at 15, fails to

---

[21]The majority acknowledges that its holding is contrary to decisions of the Eleventh, Fifth, Ninth, and Seventh Circuits and in disagreement with dicta expressed by the First Circuit.  <u>See</u> <u>supra</u> at 13-14 n.13.  Although the majority also cites <u>Amos v. Maryland Dep't of Pub. Safety & Correctional Servs.</u>, No. 96-7091, 1999 WL 454509 (4th Cir. June 24, 1999), the majority fails to acknowledge that the Fourth Circuit, like all the other circuits which have decided this issue, also held that the ADA was validly enacted pursuant to Congress's authority under § 5 of the Fourteenth Amendment.  <u>See</u> 1999 WL 454509, at *9 ("we hold that Congress acted within its constitutionally granted powers when it enacted the ADA . . . pursuant to § 5 of the Fourteenth Amendment"). The majority instead highlights the Fourth Circuit's earlier decision in <u>Brown v. North Carolina Div. of Motor Vehicles</u>.  In that case, however, the Fourth Circuit specifically stated that it was only considering the constitutionality of a federal regulation and not considering the constitutionality of 42 U.S.C. § 12132, the liability provision of Title II of the ADA.  <u>See</u> 166 F.3d at 708 n.*  ("Deciding this case on the basis of the constitutionality of 28 C.F.R. § 35.130(f), we need not pass on 42 U.S.C. § 12132 itself.").

advance the majority's position because, as <u>Cleburne</u> illustrates, arbitrary discrimination against individuals with disabilities *is* a judicially recognized equal protection violation.

I also disagree with the majority's conclusion that, in enacting the ADA, Congress exceeded its authority under § 5 of the Fourteenth Amendment because "Title II does far more than enforce the rational relationship standard recognized by the Supreme Court in <u>Cleburne</u>." <u>Id.</u> at 16. The Supreme Court has instructed that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress's enforcement power [under § 5 of the Fourteenth Amendment] even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" <u>City of Boerne v. Flores</u>, 521 U.S. 507, 518 (1997) (<u>City of Boerne</u>) (quoting <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445, 455 (1976)).[22] The majority avoids this language by ascribing to it what, in my view, is an overly-narrow interpretation. The majority reasons: "[w]e think this passage . . . is best understood as saying that Congress may prohibit conduct which itself is not necessarily unconstitutional, if to do so would rectify an *existing* constitutional violation." <u>Supra</u> at 17 (emphasis added). However, that interpretation cannot be correct for the simple reason that it entirely ignores the Supreme Court's reference to legislation which *"deters"* constitutional violations and only takes into consideration legislation which *"remedies"* constitutional violations. I am confident that the Supreme Court's reference to deterrent legislation was both intentional and meaningful because the <u>City of Boerne</u> opinion is replete with references to Congress's

---

[22]Although the Supreme Court has yet to decide the issue now before us, it has indicated that <u>City of Boerne v. Flores</u>, 521 U.S. 507, 518 (1997), sets forth the law to be applied in determining whether Congress, in enacting the ADA, validly exercised its authority under § 5 of the Fourteenth Amendment. <u>See</u> <u>Pennsylvania Dep't of Corrections v. Yeskey</u>, 118 S. Ct. 1952, 1956 (1998) ("We do not address . . . whether application of the ADA to state prisons is a constitutional exercise of Congress's power under . . . § 5 of the Fourteenth Amendment, <u>see</u> <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997).").

authority to deter or prevent constitutional violations. See, e.g., 521 U.S. at 519 ("the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern"), 520 ("there must be a congruence between the injury to be prevented or remedied and the means adopted to that end"), 524 ("[t]he remedial and preventive nature of Congress' enforcement power, and the limitation inherent in the power, were confirmed in our earliest cases on the Fourteenth Amendment"), 530 ("preventive rules are sometimes appropriate remedial measures"). Moreover, the majority's proposed interpretation does not comport with a full reading of City of Boerne because it fails to acknowledge Congress's broad discretion in fashioning remedial or preventive legislation. See, e.g., id. at 520 ("Congress must have wide latitude in determining where [the line between remedial or preventive measures and substantive measures] lies"), 536 ("it is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference") (quoting Katzenbach v. Morgan, 384 U.S. 641, 651 (1966)).

I believe that the decisive question in the present case is whether the statutory provisions in question reflect a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id. at 520; accord Little Rock Sch. Dist. v. Mauney, No. 98-1721, 1999 WL 407763 at *6-11 (8th Cir. June 14, 1999) (applying same analysis to hold that the Individuals with Disabilities in Education Act is a proper exercise of Congress's § 5 enforcement power under the Fourteenth Amendment). In other words, the constitutional injury to be prevented or remedied and the legislative means to achieve those goals must bear both a congruent and a proportional relationship to one another. It is this "congruence and proportionality" standard which allows the courts to identify legislation which exceeds Congress's § 5 authority because the legislation is, in effect, substantive in nature. See City of Boerne, 521 U.S. at 520 ("Lacking such a connection, legislation may become substantive in operation and effect.").

In City of Boerne, the Supreme Court explained that "[t]he appropriateness of remedial measures must be considered in light of *the evil presented.*" 521 U.S. at 530 (emphasis added). The legislation at issue in City of Boerne, the Religious Freedom Restoration Act (RFRA), was enacted by Congress with the stated purpose of restoring the compelling interest test set forth in Sherbert v. Verner, 374 U.S. 398 (1972), which had been abandoned when Sherbert v. Verner was overruled by Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872 (1990). RFRA prohibited any government, state or federal, from substantially burdening a person's exercise of religion, even if the burden resulted from a rule of general applicability, unless it were in furtherance of a compelling governmental interest and the least restrictive means to advance that compelling interest. RFRA applied to all federal and state laws and the implementation of such laws. Examining the "evil" that Congress sought to prevent or remedy by enacting RFRA, the Supreme Court noted, based upon RFRA's legislative record, that "the emphasis of the [congressional] hearings was on laws of general applicability which place *incidental burdens* on religion." 521 U.S. at 530 (emphasis added). Congress did not find examples of laws or governmental policies that were "enacted or enforced due to animus or hostility to the burdened religious practices" or "indicat[ing] some widespread pattern of religious discrimination in this country." Id. at 531. Indeed, the Supreme Court explained, "RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry." Id. at 530.

Turning now to the ADA, the injury or "evil" that Congress intended to prevent and remedy by enacting that legislation cannot be described as mere "incidental burdens" on the rights of the disabled. See 42 U.S.C. § 12101(a). Without repeating all of Congress's findings, I note, for the sake of comparison, the following findings made by Congress:

[D]iscrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education,

transportation, communication, recreation, institutionalization, health services, voting, and access to public services[.]

Id. § 12101(a)(3).

[I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities[.]

Id. § 12101(a)(5).

No one, including the majority, see supra at 14, seriously disputes the fact that Congress enacted the ADA upon an extensive evidentiary record and after making "detailed findings of a serious and pervasive problem of discrimination against the disabled." Coolbaugh v. Louisiana, 136 F.3d 430, 435 (5th Cir.), cert. denied, 119 S. Ct. 58 (1998).

Alsbrook's ADA claim is brought pursuant to 42 U.S.C. § 12132, which states:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Title 42 U.S.C. § 12131 provides the following pertinent definitions:

**(1) Public entity**
  The term "public entity" means –
> **(A)** any State or local government;
> **(B)** any department, agency, special purpose district, or other instrumentality of a State or States or local government; . . .

**(2) Qualified individual with a disability**
> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.[23]

These remedial provisions bear a congruent relationship to the constitutional injury to be remedied or deterred because they specifically address discriminatory treatment toward individuals with disabilities. See City of Boerne, 521 U.S. at 530 (discussing congruence in terms of the "appropriateness of remedial measures . . . in light of the evil presented"). Moreover, because a reasonableness standard is incorporated into § 12131(2) (requiring no more than "reasonable modifications"), and because Congress has broad discretion in fashioning preventive and remedial measures, I believe that these statutory provisions are also proportional to the widespread and persistent discrimination against individuals with disabilities that Congress found to

---

[23]Not only has Alsbrook "successfully completed all requirements to be a certified law enforcement officer in the State other than having a corrected vision of 20/20 in his right eye," supra at 5, but also, the "City of Maumelle admits that Mr. Alsbrook has, and can, perform all essential functions of a police officer." Alsbrook v. City of Maumelle, No. LR-C-96-68, slip op. at 2 (E.D. Ark. Mar. 24, 1997) (noting, for example, that Alsbrook has consistently scored "expert" when tested on his ability to shoot with a handgun, which indicates that he can shoot with either hand at targets on either his left side or his right side).

exist throughout our society.  See 42 U.S.C. § 12101(a).  Unlike RFRA, these statutory provisions are not "so out of proportion to a supposed remedial or preventive object that [they] cannot be understood as responsive to, or designed to prevent, unconstitutional behavior."  City of Boerne, 521 U.S. at 532.

The majority, by contrast, reasons that Congress exceeded its § 5 authority in enacting Title II because "a state's program, service, or activity, even if rationally related to a legitimate state interest and valid under Cleburne, would be struck down unless it provided 'reasonable modifications.'"  Supra at 16.  The majority also reasons that the "reasonable modifications" standard exceeds Congress's lawmaking authority under § 5 because it "prevent[s] states from making decisions tailored to meet specific local needs and instead impos[es] upon them the amorphous requirement of providing reasonable modifications in every program, service, and activity they provide."  Id. at 17.  However, both of these concerns were anticipated and dispelled by the Supreme Court when it stated in City of Boerne that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress's enforcement power [under § 5 of the Fourteenth Amendment] *even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'"*  521 U.S. at 518 (emphasis added) (quoting Fitzpatrick v. Bitzer, 427 U.S. at 455).[24]

[24]The majority additionally criticizes the "reasonable modifications" standard set forth in § 12131 on the ground that the term "reasonable modifications" is not defined in the statute itself, which, the majority reasons, contributes to "[t]he specter of open-ended obligations for a state under Title II."  Supra at 16.  If anything, this appears to be a vagueness argument, which was not asserted by appellants.  In any event, it lacks merit because, as the majority points out, id. at 16, the relevant term has been defined in the applicable federal regulations.  See 28 C.F.R. § 35.130(b)(7)(1998) (defining "reasonable modifications" to mean modifications that are "necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity being offered") (cited and interpreted, in the context of discussing the states'

Finally, I note the majority's comment that "[w]e do not think that the legislative record of the ADA supports the proposition that most state programs and services discriminate arbitrarily against the disabled." Supra at 17-18. The majority apparently assumes that, in order for Congress to abrogate the states' Eleventh Amendment immunity through an exercise of legislative authority under § 5 of the Fourteenth Amendment, there must be evidence in the legislative record supporting the proposition that "most state programs and services" are responsible for the constitutional injury to be remedied or deterred. To my knowledge, no such requirement is constitutionally imposed. In any event, I think Congress's express findings in the ADA lead inescapably to the conclusion that Congress found the states to be partly responsible for the "various forms of discrimination" suffered by individuals with disabilities. 42 U.S.C. § 12101(a)(5). As noted above, Congress specifically found that "discrimination against individuals with disabilities persists in such critical areas as *employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services*." Id. § 12101(a)(3) (emphasis added). Each of these "critical areas" of our society is, by its very nature, partially or entirely under the control of state or local government. Therefore, I think it fair to conclude that Congress had before it ample evidence indicating that state programs and services bear some responsibility for the constitutional injury that Title II of the ADA is designed to remedy and deter.

In sum, I would hold that Congress properly exercised its authority under § 5 of the Fourteenth Amendment in enacting the relevant provisions of Title II of the ADA and, consequently, appellants are not protected by Eleventh Amendment immunity from Alsbrook's ADA claim.[25]

---

responsibilities vis-a-vis the mentally disabled, in Olmstead v. Zimring, No. 98-536, 1999 WL 407380, at *12-13 (U.S. June 22, 1999)).

[25]My conclusion on this issue is unaffected by the Supreme Court's recent trilogy of cases holding invalid Congress's attempts to abrogate the Eleventh Amendment and

A true copy.

Attest:

U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

_____

subject the states to suit under the following legislation: the overtime provisions of the Fair Labor Standards Act, see Alden v. Maine, No. 98-436, 1999 WL 412617 (U.S. June 23, 1999) (Alden); the Trademark Remedy Clarification Act, see College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., No. 98-149, 1999 WL 412639 (U.S. June 23, 1999) (College Savings I); and the Patent and Plant Variety Protection Remedy Clarification Act, see Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, No. 98-531, 1999 WL 412723 (U.S. June 23, 1999) (College Savings II). Each of these cases is distinguishable from the case at bar. In Alden, the Supreme Court considered Congress's power to abrogate the Eleventh Amendment through legislation enacted pursuant to Article I of the Constitution and concluded that "the States retain immunity from private suit in their own courts, an immunity beyond the congressional power to abrogate by Article I legislation." 1999 WL 412617, at *31. The present case, by contrast, involves Congress's lawmaking authority under § 5 of the Fourteenth Amendment. In College Savings I, the Supreme Court held that Congress had exceeded its authority to enforce the due process clause through legislation enacted pursuant to § 5 of the Fourteenth Amendment because no legally cognizable property interest was at stake and, thus, the legislation did not remedy or deter a judicially recognized due process violation. 1999 WL 412639, at *5-6. As discussed above, the ADA responds to a judicially recognized equal protection violation. Finally, in College Savings II, which also involved legislation intended to enforce the due process clause, the Supreme Court found that a judicially recognized property interest was at stake, but, much like that in City of Boerne, the legislative record failed to show "'a history of widespread and persisting deprivation of constitutional rights' of the sort Congress has faced in enacting proper prophylactic § 5 legislation." 1999 WL 412723, at *11 (quoting City of Boerne, 521 U.S. at 526). In the present case, by contrast, Congress enacted the ADA upon a legislative record and specific legislative findings showing a history of widespread and persisting discrimination against individuals with disabilities, in violation of their rights under the equal protection clause.

-31-